# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

1:26-cv-1702-SAL-MGB

---

**PAMELA ELIZABETH BROWN,**

Plaintiff,

v.

RCVD – USDC COLA SC
APR 24 '26 PM2:11

**BENJAMIN COGNATA; SC HOME HOLDINGS, LLC;**

**LANDVEST HOLDINGS I, LLC; DENNIS WAYNE CATOE, ESQ.;**

**DAMON C. TERRY, SR.; MR. MORTGAGE, LLC; DAWN HAMMOND;**

**DON HAMMOND; MARTIN R. BANKS; MARY M. CASKEY, ESQ.;**

**HAYNSWORTH SINKLER BOYD, P.A.; ROB THUSS, ESQ.;**

**PALMETTO TITLE & ESCROW COMPANY; LIEUTENANT STANLEY GRAHAM;**

**JUDGE MANDY KIMMONS; CALHOUN COUNTY, SOUTH CAROLINA;**

**SHERIFF THOMAS SUMMERS; TAX ASSESSOR FOR CALHOUN COUNTY;**

**CLERK OF COURT FOR CALHOUN COUNTY; DEEDS OFFICE FOR**

**CALHOUN COUNTY; and OTHER UNKNOWN PARTICIPANTS,**

Defendants.

---

Civil Action No.: _____

## CIVIL COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**JURY TRIAL DEMANDED**

Filed Pursuant To:

18 U.S.C. §§ 1961–1964 (RICO) | 42 U.S.C. §§ 1983, 1985, 1986 (Civil Rights)

15 U.S.C. §§ 1601 et seq. (TILA) | 15 U.S.C. § 1639 (HOEPA)

12 U.S.C. §§ 2601 et seq. (RESPA) | 42 U.S.C. §§ 3601 et seq. (Fair Housing Act)

15 U.S.C. § 1691 (ECOA)

State Claims: Fraud | Forgery | Wrongful Foreclosure | Illegal Eviction | Civil Rights

---

**PLAINTIFF (Pro Se):**

Pamela Elizabeth Brown

106 Butler Drive

Livingston, South Carolina 29107

(803) 596-7218

bbrown0623@yahoo.com

Date Filed: _____

Case Number: _____

# TABLE OF CONTENTS

(Update page numbers after final print)

I. INTRODUCTION
II. JURISDICTION AND VENUE
III. THE PARTIES
    A. Plaintiff
    B. Defendants (21 Named Defendants)
IV. FACTUAL ALLEGATIONS
    A. Background: The Family Land and Plaintiff's Circumstances
    B. The First Loan — July 2017: The Trap Is Set
    C. The Second Loan — August 2017: The Scheme Expands
    D. The Payments Double — December 2017: The Trap Closes
    E. The Unlicensed Lender — BOFI Cease and Desist
    F. The First Foreclosure and the Vacated Judgment — 2018–2020
    G. The Bribe — Obstruction of Justice
    H. The Second Case — 2021–2022: The Scheme Continues
    I. The Email Evidence — Judicial Predetermination Documented
    J. The Eviction — February 2023: The Final Blow
    K. Post-Eviction: Equity Theft and Property Value Manipulation
    L. Cognata's Documented Pattern of Lawlessness
    M. The Retaliatory Custody Case and Illegal Arrest
    N. Exhaustion of State Remedies and Denial of Access to Justice
    O. The Human Cost
V. THE RICO ENTERPRISE
V-A. LEGAL AND EQUITABLE FOUNDATIONS — Anti-Dismissal Section
VI. CAUSES OF ACTION

— **PART ONE: FEDERAL LENDING LAW VIOLATIONS** —

    Count I: TILA / HOEPA / RESPA
    Count II: Fair Housing Act / ECOA

— **PART TWO: STATE LAW VIOLATIONS** —

    Count III: Fraud / Deed Forgery / Fraudulent Concealment
    Count IV: Fraudulent Conveyance and Equity Theft
    Count V: Wrongful Foreclosure
    Count VI: Illegal Eviction and Intentional Destruction of Property
    Count VII: Breach of Fiduciary Duty
    Count VIII: Abuse of Process and Malicious Use of Process
    Count IX: Civil Conspiracy and Collusion
    Count X: Fraud Upon the Court

Count XI: Declaratory Relief — Lack of Standing / Void Judgments

## — PART THREE: CIVIL RIGHTS AND CONSTITUTIONAL VIOLATIONS —

Count XII: 42 U.S.C. § 1983 — Due Process
Count XIII: 42 U.S.C. § 1983 — Equal Protection / Gender
Count XIV: 42 U.S.C. § 1983 — Unlawful Seizure of Property
Count XV: 42 U.S.C. § 1983 — First Amendment Retaliation
Count XVI: 42 U.S.C. §§ 1985 & 1986 — Civil Rights Conspiracy
Count XVII: Illegal Arrest / Imprisonment / Child Endangerment

## — PART THREE-B: ADDITIONAL STATE LAW CLAIMS —

Count XVIII: Malicious Prosecution and Abusive Contempt

## — PART FOUR: FEDERAL RICO —

Count XIX: 18 U.S.C. § 1962(c) — RICO Enterprise (13 Predicate Acts)
Count XX: 18 U.S.C. § 1962(d) — RICO Conspiracy

VII. MOTION FOR EMERGENCY AND EXPEDITED RELIEF
VIII. PRAYER FOR RELIEF (Items A–S)
IX. DEMAND FOR JURY TRIAL
X. NOTICE OF PUBLIC INTEREST DISCLOSURE
VERIFICATION
PLAINTIFF'S EXHIBIT LIST (Exhibits A through KK)
QUICK-REFERENCE TABLE OF ALL 20 COUNTS

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

### PAMELA ELIZABETH BROWN,

Plaintiff,

v.

1. **BENJAMIN COGNATA**, individually and as managing member of SC Home Holdings, LLC and Landvest Holdings I, LLC;

2. **SC HOME HOLDINGS, LLC**, a South Carolina limited liability company;

3. **LANDVEST HOLDINGS I, LLC**, a South Carolina limited liability company;

4. **DENNIS WAYNE CATOE, ESQ.**, individually and in his capacity as closing attorney, witness, and notary;

5. **DAMON C. TERRY, SR.**, individually and as owner of Mr. Mortgage, LLC;

6. **MR. MORTGAGE, LLC**, a South Carolina limited liability company;

7. **DAWN DRUMMOND**, individually;

8. **DON DRUMMOND**, individually;

9. **MARTIN R. BANKS**, individually and in his official capacity as Master-in-Equity for Calhoun County, South Carolina;

10. **MARY M. CASKEY, ESQ.**, individually and as an attorney of Haynsworth Sinkler Boyd, P.A.;

11. **HAYNSWORTH SINKLER BOYD, P.A.**, a South Carolina professional association;

12. **ROB THUSS, ESQ.**, individually;

13. **PALMETTO TITLE & ESCROW COMPANY**, a South Carolina entity;

14. **LIEUTENANT STANLEY GRAHAM**, in his individual and official capacity;

15. **JUDGE MANDY KIMMONS**, in her individual capacity;

16. **CALHOUN COUNTY, SOUTH CAROLINA**;

17. **SHERIFF THOMAS SUMMERS**, in his official capacity as Sheriff of Calhoun County, South Carolina;

18. **TAX ASSESSOR FOR CALHOUN COUNTY**, in his or her official capacity;

19. **CLERK OF COURT FOR CALHOUN COUNTY**, in his or her official capacity;

20. **DEEDS OFFICE FOR CALHOUN COUNTY**, in his or her official capacity; and

21. **OTHER UNKNOWN PARTICIPANTS** whose identities and full roles in the enterprise described herein are not yet fully known but whose participation will be established through discovery,

*Defendants.*

**Civil Action No.:**  1:26-cv-01702-SAL-MGB

<u>**COMPLAINT FOR:**</u>

(1) Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1964;

(2) Civil Rights Violations Under Color of Law, 42 U.S.C. §§ 1983, 1985, and 1986;

(3) Deprivation of Due Process and Equal Protection, U.S. Const. Amends. V and XIV;

(4) Violations of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq.;

(5) Violations of the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. § 1639;

(6) Violations of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq.;

(7) Violations of the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq.;

(8) Violations of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691;

(9) Mortgage Fraud, Forgery, and Predatory Lending under State and Federal Law;

(10) Abuse of Process and Fraud Upon the Court;

(11) Intentional Infliction of Emotional Distress;

(12) Civil Conspiracy and Breach of Fiduciary Duty;

(13) Malicious Prosecution and Abusive Contempt; and

(14) Honest Services Fraud, 18 U.S.C. §§ 1341, 1343, and 1346.

## JURY TRIAL DEMANDED

*Federal Claims: 18 U.S.C. §§ 1961--1964 (RICO); 42 U.S.C. §§ 1983, 1985, 1986; 15 U.S.C. §§ 1601 et seq. (TILA); 15 U.S.C. § 1639 (HOEPA); 12 U.S.C. §§ 2601 et seq. (RESPA); 42 U.S.C. §§ 3601 et seq. (FHA); 15 U.S.C. § 1691 (ECOA). State Claims: Fraud; Forgery; Fraudulent Conveyance; Fraudulent Concealment; Equity Theft; Wrongful Foreclosure; Illegal Eviction; Abuse of Process; Civil Conspiracy; Collusion; Fraud Upon the Court; Breach of Fiduciary Duty; Illegal Arrest; Child Endangerment; Declaratory Relief.*

---

## PRO SE LIBERAL CONSTRUCTION AND NOTICE OF MINOR VICTIM

Plaintiff is a pro se litigant and respectfully requests that this Court apply the liberal construction standard mandated by Haines v. Kerner, 404 U.S. 519 (1972), which requires that pro se complaints be held to less stringent standards than formal pleadings drafted by attorneys. Plaintiff contacted over one hundred attorneys, all of whom declined representation due to the involvement of judicial officers as defendants and the complexity of the enterprise described

herein. Plaintiff respectfully requests that procedural technicalities not be used as a substitute for substantive justice where the facts are overwhelming and independently documented.

Plaintiff further gives notice that her minor son, KOY BLAYZE HUTTO, date of birth December 23, 2013, has suffered independent constitutional injuries as a direct and proximate result of the enterprise described herein, including but not limited to: rendering him homeless for six to eight months as a result of the wrongful eviction; leaving him without his sole caregiver when Defendant Kimmons jailed Plaintiff without advance notice or ability-to-pay hearing; and subjecting him to ongoing poverty caused by the financial destruction wrought by the enterprise. Koy Blayze Hutto's independent injuries and damages are specifically pleaded herein and are not derivative of Plaintiff's claims.

## I. INTRODUCTION

This case is about a predatory criminal enterprise that targeted Pamela Elizabeth Brown --- a homeowner and mother who owned valuable family land free and clear --- and systematically stripped her of that land, her home, her equity, her possessions, and ultimately her freedom, over the course of eight years. Plaintiff brings this action pro se. It is also about the failure of every institution that should have stopped it.

In 2017, Ms. Brown needed $5,000 to pay overdue property taxes on nearly four acres of family land in Calhoun County, South Carolina --- land worth between $120,000 and $150,000 that her family had owned and paid off. She instead found herself ensnared in an unlicensed, fraudulently structured dual-mortgage scheme orchestrated by Defendant Benjamin Cognata, executed through his network of shell companies, facilitated by conflicted attorneys, closed with forged

documents, and protected by a Master-in-Equity who had previously been her own attorney on the very same property.

Over the next eight years --- through the COVID-19 pandemic, two overlapping court cases, a fraudulent property sale, a retaliatory eviction that destroyed every possession she owned, an illegal arrest and imprisonment, and the systematic dismissal of every complaint she filed with every state and federal agency --- Ms. Brown and her minor son were rendered homeless, impoverished, and without recourse. More than one hundred attorneys refused her case because a judge was involved. Every state agency dismissed or ignored her.

This complaint is the last available avenue for justice. It is filed not only to remedy the devastating harm done to Ms. Brown and her son, but to expose a pattern of predatory conduct that has victimized families across Calhoun, Lexington, Richland, and Orangeburg counties, and to demand that the enterprise responsible for it be dismantled, its members held accountable, and the laws that allowed it to function be examined.

## II. JURISDICTION AND VENUE

**1.** This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

**2.** RICO jurisdiction arises under 18 U.S.C. § 1964(c).

**3.** Civil rights jurisdiction arises under 28 U.S.C. § 1343(a)(3) and (4).

**4.** Federal lending law jurisdiction arises under 15 U.S.C. § 1640(e) (TILA/HOEPA), 12 U.S.C. § 2614 (RESPA), and 42 U.S.C. § 3613 (FHA).

**5.** This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367, as all claims arise from the same common nucleus of operative facts.

**6.** Venue is proper in the Columbia Division of the District of South Carolina under 28 U.S.C. § 1391(b)(2). All relevant events occurred in Calhoun County, South Carolina. All Defendants transacted business or committed acts within this district.

## III. THE PARTIES

### A. Plaintiff

**7.** Plaintiff PAMELA ELIZABETH BROWN ("Ms. Brown") is a homeowner and mother, and a resident of South Carolina. At all times material to this Complaint, she was the lawful title owner of residential real property consisting of approximately four acres in Calhoun County, South Carolina (the "Property"), including a 2,000 square-foot modular home with brick underpinning. The Property was family land, owned free and clear, and valued between $120,000 and $150,000. Plaintiff's current address is 106 Butler Drive, Livingston, South Carolina 29107. Plaintiff brings this action pro se.

### B. Defendants

**8.** Defendant BENJAMIN COGNATA ("Cognata") is an individual who at all relevant times operated as an unlicensed predatory lender and real estate investor through seven to eight shell limited liability companies simultaneously. He conducted numerous simultaneous court cases through these entities. He is widely recognized in the community as a predatory actor: the State newspaper of South Carolina has published quotes in which Cognata bragged about how cheaply he acquires land through tax sales. In 2020, during the COVID-19 pandemic, Cognata achieved notoriety on social media --- going viral on Twitter --- for sending eviction notices to his tenants demanding rent payment or eviction, issued just three days after the Governor of South Carolina had placed a moratorium on evictions. He sent that same notice to Plaintiff during active

litigation. These facts are documented in public records and news coverage. Cognata is named individually and as the controlling member of all related entities.

9. Defendant SC HOME HOLDINGS, LLC is a South Carolina limited liability company owned and controlled by Cognata. It was used to originate the first unlicensed loan to Plaintiff and to impose the first undisclosed mortgage on the Property. SC Home Holdings, LLC no longer appears as an active entity in South Carolina Secretary of State records. On November 5, 2019 --- while litigation against Plaintiff was ongoing --- Cognata formed a new entity, **South Carolina Rental Holdings II LLC**, continuing the same rental and property acquisition business under a new name. The dissolution of the entity subject to the BOFI Cease and Desist Order and active litigation, followed immediately by the formation of a successor entity, constitutes a fraudulent transfer of business operations designed to evade regulatory and legal accountability. Any judgment against SC Home Holdings, LLC extends to its successor entity under the doctrine of successor liability.

10. Defendant LANDVEST HOLDINGS I, LLC is a South Carolina limited liability company owned and controlled by Cognata. It was used to originate the second undisclosed loan to Plaintiff, to pursue the fraudulent foreclosure action, and to acquire Plaintiff's Property at Cognata's own judgment lien sale.

11. Defendant DENNIS WAYNE CATOE, ESQ. ("Catoe") is a South Carolina licensed attorney who served simultaneously as Cognata's personal attorney and as the closing attorney for both loan transactions with Plaintiff. Catoe also served as the witness and notary on the forged deed central to this action. He testified at trial on behalf of Landvest --- the lender --- despite having served as the closing attorney in the same transactions. His commission as a notary public expires December 13, 2026, as reflected on documents in Plaintiff's possession. South Carolina

Secretary of State records confirm that Catoe formed **MC Squared Enterprises, LLC** (Entity ID 00882020) on October 27, 2017 --- exactly two to three months after closing both fraudulent loan transactions in July and August 2017. MC Squared Enterprises is an active real estate acquisition and holding company operating in the Columbia and West Columbia, South Carolina markets, with documented property purchases and sales through at least 2024. An attorney who serves as closing attorney on two fraudulent loan transactions in July and August 2017, then forms an active real estate business entity in October 2017, has a direct personal financial interest in the local real estate market that was never disclosed to Plaintiff. This conflict was not disclosed at closing, during litigation, or at trial when Catoe testified as a witness for the opposing party. Public records research confirms that Catoe operates across at least 12 holding companies with involvement in approximately 899 property transactions, establishing him not merely as a closing attorney but as a major real estate investor with substantial personal financial interests in the local market that were never disclosed to Plaintiff at closing, during litigation, or at trial.

12. Defendant DAMON C. TERRY, SR. ("DC Terry"), is the owner of Mr. Mortgage, LLC, a licensed mortgage brokerage. Cognata recommended DC Terry to Plaintiff as her mortgage broker for the second loan transaction. DC Terry was present at the second closing. Despite ostensibly serving as Plaintiff's broker and being presented to her as a neutral party, DC Terry subsequently testified at the final trial hearing on behalf of Landvest Holdings --- Cognata's company --- against Plaintiff's interests. This undisclosed dual loyalty constitutes a conflict of interest and a breach of fiduciary duty.

13. Defendant DAWN DRUMMOND is an individual who, at the time of the first loan transaction, stated that she worked with or for Cognata. Prior to the first closing, Dawn

Drummond called Plaintiff and instructed her to bring her father to the closing at Palmetto Title & Escrow, falsely representing that there was a routine boundary discrepancy with one acre of Plaintiff's land related to her deceased brother's name. Dawn Drummond was present at the closing and served as a witness on the forged deed instrument.

**14.** Defendant DON DRUMMOND is an individual believed to be the husband or associate of Dawn Drummond. After Plaintiff questioned the deed documents, Don Drummond participated in correspondence concerning the deed, the nature of which is relevant to the fraudulent scheme described herein.

**15.** Defendant MARTIN R. BANKS ("Banks") is the Master-in-Equity for Calhoun County, South Carolina --- a position he has held for approximately twenty years, well beyond the six-year term contemplated under South Carolina law. Banks has no valid oath of office on file at the Calhoun County Courthouse, which Plaintiff confirmed upon inquiry. Banks no longer resides in Calhoun County, yet continues to preside as its Master-in-Equity. Banks owns significant land holdings within Calhoun County --- the very county over which he exercises judicial authority --- and has been observed purchasing properties at below-market prices at the same tax sales over which he exercises judicial control. He simultaneously maintained an active private law practice under the name Banks & Neumeister, Attys. at Law, LLP (Exhibit EE), using the same personal Gmail account (martin.banks@gmail.com) for both his private legal business and his judicial communications, in violation of the South Carolina Code of Judicial Conduct. Most critically: Banks previously served as Plaintiff's personal attorney in connection with the same Property at issue in the foreclosure proceedings. His name appears on Plaintiff's original deed documents (Exhibit F). That prior representation was not merely incidental --- it ended in a direct dispute. Banks made an error on Plaintiff's deeds. When Plaintiff demanded he

an error on Plaintiff's deeds. When Plaintiff demanded he correct his own mistake at no additional charge, Banks refused, insisting on being paid again. Plaintiff persisted; Banks claimed he had corrected it. Years later, Plaintiff discovered he had not. The uncorrected error left one acre of Plaintiff's land appearing to be in her deceased brother's name --- which is precisely the acre that Cognata and Catoe later used as the vehicle for the forged deed. In other words, the forgery that transferred Plaintiff's property without her knowledge was only possible because Banks failed to correct his own mistake. Banks knew all of this when he presided over the foreclosure proceedings and declined to recuse. He had a personal, financial, and reputational stake in the outcome of a case whose factual foundation he had personally helped create through his own prior error. Despite this disqualifying history involving the identical subject matter and the identical property, Banks presided over both of Plaintiff's foreclosure cases, refused to recuse himself when presented with documented proof of the conflict, and entered dispositive orders against Plaintiff in each case. He is sued individually for acts taken without jurisdiction and in violation of clearly established constitutional rights.

16. Defendant MARY M. CASKEY, ESQ. ("Caskey") is a South Carolina licensed attorney and a member of Haynsworth Sinkler Boyd, P.A. She represented Landvest Holdings throughout the state court proceedings. In addition to coordinating legal strategy that facilitated the suppression of Plaintiff's legitimate defenses, Caskey failed to certify to the court that the lender held a valid lending license --- a violation of her professional obligations under the South Carolina Rules of Professional Conduct. Further, Caskey testified under oath during the proceedings that the SC Home Holdings loan did not exist --- a statement directly and conclusively contradicted by the documentary record, including the mortgage and billing statements in Plaintiff's possession. Caskey's firm's name appeared in connection with deed-related documents, and she coordinated

directly with Defendant Banks through his personal Gmail account to draft orders at his direction and lobby against Plaintiff's motions outside of formal proceedings.

17. Defendant ROB THUSS, ESQ. ("Thuss") is a South Carolina licensed attorney who initially represented Plaintiff in the foreclosure proceedings. Public court records from Lexington County Common Pleas Court, Case No. 2011-CP-32-02050 (Branch Banking and Trust v. Gary C. Landry et al.), confirm that Thuss appeared as counsel in a case where Benjamin Cognata and Cognata Properties LLC were also named parties — a relationship spanning 2011 to 2019, predating his representation of Plaintiff and never disclosed to her. (Exhibit KK) Thuss filed a successful motion for relief from judgment. However, after the first foreclosure was vacated, Thuss presented Plaintiff with a written settlement offer originating from Cognata's side of the case --- a five-page document drafted by Caskey on behalf of Landvest Holdings, which included a $2,500 payment directly to Thuss from the opposing party, permanent confidentiality provisions (Paragraph 11), a prohibition on any future legal claims by Plaintiff (Paragraph 15), and zero consideration to Plaintiff herself. Plaintiff's fiancé, who was present and read the document, confronted Thuss directly about its terms. Thuss departed immediately, leaving the settlement document behind. Plaintiff refused to sign. Thuss thereafter withdrew from Plaintiff's representation. In presenting this offer, accepting payment from the opposing party, and urging Plaintiff to sign away all her claims, Thuss acted as an agent of the opposing party against his own client, breached his fiduciary duty, violated the Rules of Professional Conduct, and committed obstruction of justice and witness tampering under 18 U.S.C. §§ 1503 and 1512. This conduct is independently actionable and constitutes a RICO predicate act. The written settlement document is in Plaintiff's possession as Exhibit O.

**18.** Defendant PALMETTO TITLE & ESCROW COMPANY ("Palmetto") is a South Carolina company that served as the closing agent for both fraudulent loan transactions. The closings at which the forged deed was executed and the fraudulent loan documents were signed took place at Palmetto's offices. Palmetto facilitated, or failed to prevent, the execution and recording of instruments containing material misrepresentations and forgeries.

**19.** Defendant SHERIFF GRAHAM ("Graham") is a law enforcement officer employed by Calhoun County. Graham initially refused to enforce the writ of ejectment, acknowledging that Plaintiff's appeal was pending. Despite that appeal remaining pending and unanswered to this day, Graham returned and enforced the eviction. He had earlier expressly assured Plaintiff that enforcement would be delayed while her appeal was pending. Graham then supervised the eviction without advance warning and in direct violation of his assurance, during which Plaintiff's personal property was deliberately destroyed. When Plaintiff attempted to intervene to stop the destruction, Graham repeatedly threatened to arrest her in front of her mother and the moving crew and called her "stupid" on multiple occasions. He is sued individually and in his official capacity.

**20.** Defendant JUDGE MANDY KIMMONS ("Kimmons") is a judicial officer who presided over a custody and contempt proceeding against Plaintiff. Prior to presiding over this matter, Kimmons had served as a South Carolina state representative, from which position she resigned before this case arose; she was subsequently rezoned into Plaintiff's judicial district despite having no prior familiarity with Plaintiff's circumstances and did not investigate Plaintiff's case or background before proceeding. At the outset of the hearing, Kimmons disclosed that her husband was employed by the same company as the opposing party. Plaintiff's attorney did not object and the case proceeded. Notwithstanding that disclosure, Kimmons did not recuse herself,

as the South Carolina Rules of Judicial Conduct required. Beyond that disclosed conflict, South Carolina Secretary of State records reveal that Kimmons is the registered agent of **206 Ocean #220 LLC** (Entity ID 00971589), a domestic limited liability company currently in Good Standing, effective May 29, 2019, registered at 108 Sullivans Landing Road, Ridgeville, South Carolina. The name "206 Ocean #220" is consistent with a vacation property holding company for a specific unit --- likely Unit 220 at a North Myrtle Beach resort property. Kimmons actively maintained this real estate LLC throughout the period of her presiding over Plaintiff's case, filing a change of registered agent address as recently as December 8, 2023. A judge with an active, undisclosed real estate holding interest of any kind presiding over any judicial proceeding is required to disclose that interest to the parties. The South Carolina Code of Judicial Conduct requires disclosure of financial interests that could reasonably be questioned by a party, regardless of the subject matter of the proceeding. Kimmons never disclosed this interest to Plaintiff in the family court contempt matter. Plaintiff was never given the opportunity to raise it or seek recusal on that basis. Kimmons denied Plaintiff the right to call any witnesses in her own defense, imposed a contempt sentence of thirty days in jail that was grossly disproportionate and legally unsupportable, and failed to conduct a mandatory ability-to-pay hearing before imposing an incarceration sentence conditioned on payment of opposing attorney fees. Kimmons has a documented history of imposing incarceration sentences against mothers conditioned on payment of opposing counsel's fees, and has been listed on the South Carolina Judges Wall of Shame. She is sued individually for acts taken in excess of her jurisdiction and in violation of clearly established constitutional rights.

**21.** Defendant CALHOUN COUNTY, SOUTH CAROLINA ("the County") is a governmental entity liable under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978),

for maintaining policies, customs, and practices that permitted the constitutional violations described herein, and for its deliberate indifference to the civil rights of its residents, particularly those who are financially vulnerable or pro se litigants challenging the county's entrenched power structure.

22. Additional unknown participants whose identities and full roles in the enterprise described herein have not yet been fully ascertained include employees and agents of the Calhoun County Clerk of Court, the Calhoun County Property Assessor's office, the Register of Deeds, and other government offices and private entities whose participation in the scheme will be established through discovery.

## IV. FACTUAL ALLEGATIONS

### A. Background: The Family Land and Plaintiff's Circumstances

23. Plaintiff's Property --- nearly four acres including a 2,000 square foot modular home with brick underpinning in Calhoun County, South Carolina --- was family land that Plaintiff's parents originally purchased and divided among their children. The Property was immediately adjacent to Plaintiff's mother's residence on the same family land. The land was owned free and clear. It was appraised between $120,000 and $150,000. To Plaintiff's family, it represented more than financial value --- it was their home, their roots, and their legacy.

24. In 2017, Plaintiff was a mother of two minor children, both residing with her at the Property, engaged to be married, with her fiancé residing with her on the Property. She was working part-time, earning approximately $15,000 per year. She needed $5,000 to pay overdue property taxes in order to save her family's land --- land she had identified as in arrears through her own monitoring. Defendant Cognata is known to monitor county tax delinquency records specifically

to identify financially vulnerable property owners with equity-rich land, targeting them before those owners can find other solutions. Plaintiff had no prior experience with mortgage transactions, real estate loans, or legal proceedings. She was financially vulnerable, legally unsophisticated, and entirely trusting of the professionals she engaged.

**B. The First Loan --- July 2017: The Trap Is Set**

**25.** A friend referred Plaintiff to Benjamin Cognata as a private lender. Cognata agreed to loan Plaintiff $5,000 at 8% interest, secured by her land and home. The terms appeared manageable. Plaintiff agreed.

**26.** Before the first closing at Palmetto Title & Escrow in Columbia, Plaintiff received a call from Defendant Dawn Drummond, who identified herself as working with or for Cognata. Dawn Drummond told Plaintiff that there was a discrepancy: one acre of Plaintiff's land was listed in the name of her deceased brother, and Plaintiff's father needed to come to the closing to clarify the property boundaries. This statement was pretextual. Its purpose was to bring Plaintiff's elderly father to the closing so that the enterprise could use his presence to manufacture a basis for altering the deed.

**27.** At the closing, attended by Cognata, Catoe, Dawn Drummond, and others, Plaintiff's father was asked to write family members' names next to their respective lots on a deed document. He complied, believing it was routine. The enterprise then used this signing event to produce a deed bearing the forged signature of Plaintiff's deceased brother --- a person who had been dead since 2014 and could not have signed any document in 2017 (Exhibit E). Defendant Dawn Drummond served as the witness on this forged instrument. Defendant Catoe, serving simultaneously as Cognata's personal attorney and as the closing attorney on the mortgage transaction, notarized the forged deed --- certifying as an officer of the court that a dead man's signature was genuine.

Defendant Don Drummond subsequently participated in correspondence about the deed when Plaintiff questioned it.

28. CRITICAL FACT: The deed to Plaintiff's Property was illegally transferred out of Plaintiff's name on the same day the first loan was signed --- July 2017. This was not the result of error. A deed transfer executed on the same day as a loan closing, without Plaintiff's knowledge or informed consent, is direct evidence of premeditation. The enterprise had planned the property acquisition from the beginning.

29. At this same closing, Cognata increased the proposed loan from $5,000 to $20,000, with $5,000 to be given immediately and $15,000 to follow. Plaintiff expressed serious concern about whether she could afford the higher amount given her income. Cognata resolved her hesitation by offering her fiancé, Shartier Warren, a paying construction job --- an inducement made specifically to overcome Plaintiff's stated objection to the larger loan amount. Cognata told Shartier he was hired and to expect to start in a few weeks. He never contacted Shartier again. The job offer was a deliberate lie designed to extract Plaintiff's signature on a larger loan. It worked. Plaintiff signed. The loan was documented as a transaction with SC Home Holdings, LLC, at $358 per month.

### C. The Second Loan --- August 2017: The Scheme Expands

30. Weeks later, Cognata told Plaintiff she needed to get a mortgage broker, homeowners insurance, and an attorney for additional paperwork. Plaintiff did not realize she was entering into a second mortgage. Cognata recommended Defendant DC Terry (Damon C. Terry, Sr., owner of Mr. Mortgage, LLC) as her broker. Plaintiff trusted this recommendation.

31. Plaintiff paid approximately $600 out of pocket for homeowners insurance, arranged an inspection, and attended a second closing with DC Terry, Catoe, and other enterprise members.

She relied entirely on DC Terry as her mortgage broker and on Catoe as the closing attorney to review, certify, and protect her interests in the documents she was signing --- that is precisely why they were engaged. Both failed entirely in that professional obligation: DC Terry did not disclose his alignment with the lender, and Catoe did not disclose that he was simultaneously Cognata's personal attorney. Neither flagged any of the numerous material deficiencies in the documents.

**32.** The second loan was structured through Landvest Holdings I, LLC --- a company Plaintiff had never heard of and had never agreed to do business with. She had not been told there would be a second lender, a second company, or a second mortgage. This was never disclosed.

**33.** Both loan instruments contained multiple, irreconcilable figures. Plaintiff's bank wire transfer record confirms she received total disbursements of $18,000 across both loans. The promissory note states a principal of $25,000. The mortgage document states $35,000. The HUD-1 Settlement Statement (Exhibit D)s reflect yet other figures. These amounts do not match each other, do not match what Plaintiff agreed to, and do not match what she received. No explanation was ever provided for either mortgage.

**34.** The closing documents also charged Plaintiff double closing costs --- closing fees for both the SC Home Holdings transaction and the Landvest transaction. Several line items on the settlement statements had dollar amounts with no description beside them --- charges for services that were never identified. Most egregiously, Plaintiff was charged for an appraisal that was never performed. No appraiser visited the property. No appraisal report was produced. The charge was fabricated. Furthermore, at least one mortgage document identifies the county as **Lexington County** rather than **Calhoun County** --- where Plaintiff's property is actually located. This error was never corrected. A mortgage recorded in the wrong county creates a

defective title instrument and further demonstrates that these documents were generic, pre-fabricated forms not prepared for Plaintiff's specific transaction. On the same document, Defendant Catoe wrote the wrong year in a pre-printed date blank at the closing table before crossing it out --- confirming that the closing attorney himself was not reviewing these instruments with any care. Taken together, the wrong county, the wrong year, the wrong principal amounts, the fabricated appraisal charge, and the double closing costs paint a picture of mass-produced loan instruments that were never designed to be legitimate.

**35.** Defendant DC Terry testified at the final trial hearing --- not on behalf of Plaintiff, whose broker he was --- but on behalf of Landvest Holdings, Cognata's company, against Plaintiff. Terry's testimony supported Cognata's position. Plaintiff was never informed that the broker Cognata recommended to her would testify against her in court. This undisclosed conflict of interest between broker and lender is a breach of fiduciary duty, a violation of RESPA, and evidence of the coordinated enterprise.

### D. The Payments Double --- December 2017: The Trap Closes

**36.** In December 2017, Plaintiff received two bills in the mail --- one from SC Home Holdings for $358, and a second from Landvest Holdings for $358, each with an additional $75 late fee despite her payment being current. Invoices were sent through a company called The Rental Gal, which Plaintiff had never heard of. Plaintiff immediately contacted Cognata, who told her she now had two mortgage payments. This was the first time Plaintiff learned of the second mortgage. She had never agreed to two mortgages, two lenders, or two sets of monthly payments on her $15,000 annual income.

**37.** When Plaintiff protested, Cognata told her to focus exclusively on the LandVest Holdings payment and told her not to worry about the SC Home Holdings payment, representing that he

could not foreclose on that loan. This was false. Plaintiff attempted to make payments when she could, but with doubled obligations, no assistance, and a broken promise of employment for her fiancé, she fell behind.

**38.** Plaintiff never received credit for any payment she made. The balance did not decrease --- it grew. The court record confirms that Banks entered judgment for $49,874.76 in Case 2018-CP-09-00118 on May 4, 2021, and $56,745.41 in Case 2021-CP-09-00174 on May 18, 2022 --- both on an original disbursement of $18,000, with no accounting ever provided and not a single payment credited.

### E. The Unlicensed Lender --- BOFI Cease and Desist

**39.** Before the loans were ever made, neither Cognata, SC Home Holdings, LLC, nor Landvest Holdings I, LLC held a valid mortgage lending license from the State of South Carolina, as required by S.C. Code § 37-22-110. The issuance of a mortgage by an unlicensed entity is void and unenforceable under South Carolina law.

**40.** Plaintiff's custody attorney discovered the mortgage documents on her coffee table in early 2018 and immediately recognized them as predatory. He contacted the South Carolina Department of Consumer Affairs on Plaintiff's behalf. Consumer Affairs staff --- specifically Kenneth Middlebrook and Brian Gibbs --- confirmed that Cognata was already under investigation for predatory lending and unlicensed activity involving victims across multiple South Carolina counties, including Calhoun, Lexington, Richland, and Orangeburg. They assured Plaintiff they were working on it. They advised her to file a complaint with the South Carolina Board of Financial Institutions ("BOFI"). Plaintiff did so.

**41.** In or about November 2018, BOFI issued a formal Cease and Desist Order against Cognata, SC Home Holdings, and Landvest Holdings, ordering the immediate cessation of all mortgage

lending and servicing activity. Plaintiff possesses copies of these orders obtained from official records.

**42.** Cognata received the Cease and Desist Order. He continued the foreclosure anyway. Consumer Affairs, which had been investigating victims across multiple counties, subsequently dropped all investigations without enforcement action and without explanation. To this day, no state agency has been held accountable for that failure.

**F. The First Foreclosure and the Vacated Judgment — 2018–2020**

**CONSUMER AFFAIRS — DOCUMENTED INVESTIGATION AND ABANDONMENT**

The South Carolina Department of Consumer Affairs, through its staff members Kenneth Middlebrook and Brian Gibbs, communicated directly with Plaintiff and confirmed that Defendant Cognata was already under active investigation for predatory lending and unlicensed mortgage activity involving victims across multiple South Carolina counties, including Calhoun, Lexington, Richland, and Orangeburg. Plaintiff possesses emails and text message communications from these staff members confirming the existence of the investigation and advising Plaintiff to file a complaint with the South Carolina Board of Financial Institutions. Consumer Affairs subsequently dropped every investigation without enforcement action and without providing any explanation to Plaintiff or, upon information and belief, to any other victim.

When Plaintiff submitted a formal certified complaint packet to Consumer Affairs documenting the enterprise, the agency returned Plaintiff's packet to her unopened. Plaintiff retains the original

sealed envelope as documentary evidence. The abandonment of a confirmed multi-county investigation into an unlicensed lender operating under active Cease and Desist Orders --- without explanation and without enforcement action --- at minimum constitutes the institutional failure that enabled the enterprise to continue operating with impunity. Whether that failure was negligent or coordinated will be determined through discovery of Consumer Affairs' internal communications and investigation files.

**43.** In August 2018, Landvest Holdings --- not SC Home Holdings, the entity with which Plaintiff contracted --- filed a foreclosure action in Calhoun County Court of Common Pleas, Case No. 2018-CP-09-00118. The case was referred to Defendant Martin R. Banks, Master-in-Equity for Calhoun County. Banks was Plaintiff's own prior attorney on the same Property's deed --- a fact recorded in the county's own deed records. He did not recuse himself.

**44.** At the March 2019 hearing, Plaintiff, appearing pro se, attempted to present the discrepancies in the loan amounts, the existence of a forged deed, and evidence of unlicensed lending. The judge did not wear a robe. No one was asked to rise. Banks appeared personally familiar with Cognata --- Plaintiff overheard them discussing boating on a lake before the hearing. Despite Plaintiff's evidence, Banks ordered foreclosure.

**45.** Days later, Plaintiff received confirmation from BOFI that the cease and desist had been issued. Plaintiff retained attorney Rob Thuss, who filed a successful Rule 60(b) motion. On February 3, 2020, Banks issued an Order setting aside and vacating the Order and Judgment of Foreclosure and Sale in Case No. 2018-CP-09-00118, and granted Plaintiff leave to file counterclaims. This was a victory.

**46.** However, when Plaintiff checked the public index --- the online public court record --- the vacated foreclosure case was not listed as "vacated" or "dismissed." It was listed as "satisfied" (Exhibit M) --- as if the debt had been paid off. This is false and constitutes a fraudulent alteration of the public record. A vacated judgment is not a satisfied judgment. The distinction is legally material and the mislabeling deceives any person reviewing the record.

## G. The Bribe --- Obstruction of Justice

**47.** After the February 2020 victory vacating the foreclosure, Plaintiff's own attorney, Rob Thuss, presented her with a written settlement offer that originated from Cognata's side of the case. The offer --- a five-page document drafted by Caskey --- proposed that Plaintiff abandon all of her legal claims in exchange for zero consideration to herself, while Thuss would receive a $2,500 payment directly from the opposing party. The document contained a permanent confidentiality clause (Paragraph 11) and a lifetime prohibition on future legal claims (Paragraph 15). Plaintiff's fiancé was present, read the document, and confronted Thuss directly. Thuss departed immediately and left the document behind. Plaintiff refused to sign. The document is in Plaintiff's possession as Exhibit O.

**48.** Thuss thereafter withdrew from Plaintiff's representation. In presenting this offer, accepting payment from the opposing party while still representing Plaintiff, and urging Plaintiff to accept it, Thuss acted as an agent of the opposing party against his own client, breached his fiduciary duty, violated the Rules of Professional Conduct, and committed obstruction of justice and witness tampering under 18 U.S.C. §§ 1503 and 1512. This conduct is independently actionable and constitutes a RICO predicate act.

## H. The Second Case --- 2021–2022: The Scheme Continues

**49.** After the first foreclosure was vacated, Cognata did not stop. Through attorney Caskey, he purported to convert the original case to a "suit on the promissory note" --- a different theory on the same underlying obligation --- without providing Plaintiff formal notice that the foreclosure claim was being abandoned and a new theory was being pursued. Simultaneously, a brand new case, Case No. 2021-CP-09-00174, was filed based on a judgment lien. Both cases were referred to the same Master-in-Equity: Martin R. Banks. Both cases overlapped simultaneously, with both lis pendens active at the same time against the same property (Exhibit N). The filing of a second case to circumvent the effect of Plaintiff's successful appeal, without formal notice of the conversion of the first case, is an abuse of process and evidence of the enterprise's use of the court system as a tool of extraction.

**50.** In the new case based on the judgment lien, Plaintiff was served with a motion for default --- for a debt she had received no instructions on how, when, or where to pay, and which was complicated by the existence of two different companies involved in the original transaction. The Department of Revenue inserted itself into the case, filing liens against Plaintiff that did not belong to her. Plaintiff challenged these false liens and demanded proof. After Plaintiff filed her motion challenging them, the Department of Revenue filed documentation confirming the liens did not belong to her. The liens require full removal from all public records associated with Plaintiff.

**51.** Banks entered a default judgment, then a Master-in-Equity Order and Judgment of Foreclosure and Sale. A Master-in-Equity in South Carolina has equitable jurisdiction over matters referred to him. A judgment lien foreclosure is a legal --- not equitable --- proceeding. Banks lacked subject matter jurisdiction to enter this order. The order is void.

**52.** The final judgment amounts are now confirmed from the court record. In Case 2018-CP-09-00118, Banks entered a final order on May 4, 2021 awarding Landvest $34,874.76 on the note plus $15,000 in attorney fees, for a total of **$49,874.76** (Exhibit I). In Case 2021-CP-09-00174, Banks entered a second order on May 18, 2022 for **$56,745.41** (Exhibit J) as of May 11, 2022. At the foreclosure sale, Cognata was the only bidder and submitted a credit bid of exactly $56,745.41 --- paying himself with Plaintiff's own equity and receiving the $120,000--$150,000 property at no actual cost. Plaintiff received zero. No accounting was ever provided. Plaintiff never received credit for any payments made. The inflation of an $18,000 total disbursement into two separate judgments --- $49,874.76 in the first case and $56,745.41 in the second --- totaling over $106,000 across two consecutive cases, with no credible accounting, is evidence of deliberate fraudulent debt fabrication and the systematic destruction of Plaintiff's equity.

**53.** Both lis pendens --- one for each case --- remain marked as PENDING on the public index (Exhibit N) as of the date of this Complaint's filing. This ongoing cloud on the title to Plaintiff's former Property is a continuing harm, preventing any clear title resolution and impairing Plaintiff's ability to assert her property rights.

## I. The Email Evidence --- Judicial Predetermination Documented

**54-A.** The email record in this case constitutes extraordinary and direct proof of judicial coordination with the opposing party. On May 8, 2021, Defendant Banks sent an email from his personal Gmail account (martin.banks@gmail.com) to Caskey, with Plaintiff copied, stating: *"Motion granted without a hearing and by consent. Ms. Caskey, please draft an order granting the relief you requested at trial. I will award $15,000 in attorney fees because of the trouble your client got into and caused. Be sure to cite the credibility of each of your witnesses."* On May 17,

2021, Caskey submitted a proposed order drafted in compliance with these instructions. Banks replied: "Please efile your proposed order." The order directing the foreclosure of Plaintiff's home was written by the opposing party's attorney, at the judge's direction, specifying in advance what it would say and who would be found credible.

**54-B.** This same email contains the phrase "by consent." Plaintiff explicitly notified Banks in writing on May 10, 2021 that she had not consented: *"I did not give my consent to Mrs. Caskey. She is aware of this because I replied to her email that I did not."* On May 11, Banks himself acknowledged in writing: *"Ms. Brown's email says that she does NOT confirm admission of the documents."* One day later, on May 12, 2021, Banks reversed course and ordered: *"It appears that Ms. Brown consented. I ruled. Prepare the order."* Banks entered an order "by consent" after acknowledging in his own words that Plaintiff had not consented. This manufactured consent is a fraudulent statement in a judicial instrument and destroys any immunity defense.

**54-C.** On January 17, 2023, Caskey emailed Banks at his personal Gmail account lobbying him not to schedule a hearing on Plaintiff's motions: *"the motions do not appear to raise any new issues."* Banks responded at 2:59 AM on January 18, 2023. On February 5, 2023, Banks emailed Caskey: *"Ms. Caskey please prepare an order, and eviction will be set for February 24 at 10am."* The eviction of Plaintiff and her child from their home was set by private email between the judge and opposing counsel, without a hearing, without notice, and outside any formal court proceeding. Banks's email signature on this and all related correspondence identifies him simultaneously as *"Banks & Neumeister, Attys. at Law, LLP, 716 F.R. Huff Dr., St. Matthews, SC 29135"* --- confirming his simultaneous operation of a private law practice from the same account used for judicial communications.

### J. The Eviction --- February 2023: The Final Blow

**54.** In January 2023, Plaintiff was served with a Writ of Assistance (Exhibit K). Defendant Graham delivered the notice and assured Plaintiff, explicitly, that the eviction would not be enforced while her appeal was pending and that enforcement would be delayed until the following Monday at the earliest. Relying entirely on this assurance, Plaintiff did not pack her belongings or arrange for their removal.

**55.** The next morning --- without advance warning and without honoring his assurance --- Cognata's moving team arrived with trucks and Graham oversaw the enforcement. Rather than transporting Plaintiff's belongings to her mother's home, which was immediately adjacent on the same family land --- which Plaintiff explicitly requested --- Cognata's agents carried everything to the far end of the long wooded driveway, near the public road, exposed to the elements.

**56.** That afternoon, a violent storm destroyed everything Plaintiff owned: furniture, electronics, clothing, fifteen years of accumulated family belongings, irreplaceable personal and legal documents, and her son Koy Hutto's Christmas gifts. This storm had been widely forecast and publicly reported for more than a week before the eviction date. Cognata, Graham, and all parties involved in scheduling and executing the eviction on that date knew the storm was coming. Plaintiff and her family spent the entire weekend in the pouring rain salvaging what little they could from the wreckage of their lives. Because of the continuous rain, Plaintiff was unable to contact law enforcement about the destruction until Sunday. In the interim, Plaintiff photographed the destruction and sent the images by text message to a law enforcement officer she knew personally at the department, documenting the damage in real time. The loss is no less than $150,000, which is itself a conservative estimate --- the full contents of a family home accumulated over fifteen years cannot be completely inventoried from memory, and the actual value is believed to be substantially higher.

**57.** Graham was present during the eviction. When Plaintiff attempted to intervene to stop the destruction of her belongings, Graham repeatedly threatened to arrest her and called her "stupid" on multiple occasions in front of her mother and the moving crew. Graham stated he "did not see anything" when Plaintiff pointed to the damage. Witnesses passing by the property observed movers pushing Plaintiff's belongings directly off trucks and contacted Plaintiff to warn her. When Plaintiff went to Graham and begged him to go down to the driveway to witness the destruction, he refused. The belongings had been deliberately moved to the far end of the long wooded driveway --- out of sight from the road and the house --- a location that ensured the destruction could not be easily observed or stopped. Among the belongings, Plaintiff discovered that her jewelry had been thrown into the surrounding woods --- items that could easily have been moved with care but were instead scattered into the trees. This was not careless handling. This was deliberate. After the eviction, when Plaintiff walked to the house on a subsequent occasion to knock on the door and attempt to retrieve her remaining outdoor belongings, Cognata's agents called law enforcement and had a no-trespassing order placed against her. Plaintiff had done nothing more than walk to the front door of the home where she had lived for years. Her outdoor belongings --- including a large roll of fencing she had purchased in preparation for a fence installation, rakes, outdoor tools, trash cans, and all exterior equipment --- remained on the property and she was given no opportunity to retrieve them. Under South Carolina law, Plaintiff was entitled to access to retrieve her personal property. That right was denied. After the eviction, Plaintiff discovered that surveillance cameras at a nearby commercial facility that would have faced the eviction site had been removed. Plaintiff visited the facility and was informed by staff that the cameras had been taken down. The exact timing of their removal is unknown, but they had previously been present and were gone when Plaintiff investigated.

When Plaintiff informed Cognata of the destruction, his only reply was: "my favorite lady." (Exhibit Q) This statement reflects deliberate contempt for the harm he had caused.

**57-B.** The night of the eviction, Plaintiff called law enforcement to come and witness the destruction of her belongings. An officer responded and personally observed the condition of Plaintiff's property and the scene. He did not write a report and did not exit his patrol vehicle. Law enforcement witnessed the destruction firsthand and took no action to document it, preserve evidence, or protect Plaintiff's property rights. Neighbors from the surrounding area stopped their vehicles along the road because they could not believe what they were seeing. Multiple community witnesses observed the scene.

**57-C.** Prior to the issuance of the Writ of Assistance, following the final court proceeding (Exhibit O), Defendant Cognata asked Defendant Caskey to leave the room and approached Plaintiff privately. He told Plaintiff he did not want her property and offered to allow her to lease it from him, stating words to the effect of: "as much as I don't want to be your landlord, you can lease from me." Plaintiff declined. This private admission is devastating to any claim that Cognata was an innocent creditor pursuing a legitimate debt. A party who has legitimately won a fair proceeding does not privately offer the prevailing property back to the losing party. This offer is direct evidence of consciousness of guilt --- an acknowledgment by Cognata himself that what had been done to Plaintiff was wrong, that the property should not have been taken, and that he knew it. It is noted in one of the court orders that Graham was directed to enforce the eviction but initially declined to do so in recognition of Plaintiff's pending appeal --- the correct decision. His subsequent enforcement, after providing Plaintiff with an explicit assurance of delay, transformed a lawful ministerial act into an unconstitutional deprivation.

**58.** This eviction and the destruction of Plaintiff's possessions broke her family apart. Ms. Brown and her son Koy were homeless for six to eight months. They lost everything. They are currently barely getting by, living in poverty. The trauma of this experience --- losing their home, their land, everything they owned, and their sense of safety --- has had a devastating and lasting impact on both Plaintiff and her minor child.

**58-A.** The destruction did not end with the eviction weekend. On Monday morning following the Friday eviction, Defendant Cognata arrived at the Property with a backhoe and used it to scrape and remove all remaining belongings that Plaintiff and her family had been unable to retrieve over the weekend. Plaintiff's family had spent the entire weekend in a violent storm attempting to salvage what remained. Whatever survived that storm was destroyed on Monday morning by Cognata's mechanical equipment. This was not cleanup. This was the calculated, mechanized elimination of every last trace of Plaintiff's life on that property, carried out by Cognata's agents using heavy equipment at his direction, days after the eviction. The fact that Cognata had a backhoe at the property on Monday morning --- days after the Friday eviction --- demonstrates advance planning and premeditation. This act constitutes conversion, intentional destruction of personal property, and a criminal act under South Carolina law, and is an independent RICO predicate act.

### K. Post-Eviction: Equity Theft and Property Value Manipulation

**59.** Cognata caused Plaintiff's Property to be acquired at his own judgment lien sale. As the acquiring party, Cognata obtained --- through his own company --- the property he had taken through his own fraudulent scheme, at a price he effectively controlled. The validity of a party acquiring property at a sale generated by his own judgment lien, on a fraudulently structured

debt, through proceedings presided over by a disqualified judicial officer, is legally and equitably void.

**60.** Following the sale, Plaintiff was legally entitled to receive the surplus equity: the difference between the sale price and the judgment amount. The Property was owned free and clear of any prior debt and was valued between $120,000 and $150,000 at the time of the taking. The full equity belonged to Plaintiff. She received nothing. When she sought an accounting, there was no response. No documentation, no accounting, no explanation has ever been provided. The full equity value owed to Plaintiff is to be established through accounting and appraisal in these proceedings.

**61.** Within days of Plaintiff's eviction, the Calhoun County Property Assessor reduced the assessed value of the Property by approximately $100,000. This reduction is not credible for multiple reasons. The property had been continuously and actively occupied and well-maintained by Plaintiff and her family throughout the entire period of litigation. Furthermore, the insurance history of the Property directly contradicts any claim of deterioration. Cognata had personally recommended that Plaintiff use Bray's Insurance for her homeowners coverage as a condition of the mortgage transaction. Bray's inspected the Property before the mortgage was issued and Plaintiff passed that inspection. Months later, Bray's cancelled Plaintiff's insurance, claiming there was a visible spot on the roof --- on a property with no neighboring homes close enough to observe the roof. There was no spot on the roof and there had been no leaks. When Plaintiff complained, Bray's issued her a partial reimbursement of her premium. However, as a direct result of the cancellation, Plaintiff was forced to immediately obtain emergency replacement homeowners insurance through Nationwide. Cognata sent Plaintiff a text message explicitly stating that if she did not maintain insurance he would foreclose (Exhibit Q). The manufactured

insurance cancellation --- by an insurer Cognata himself had recommended --- created a financial emergency under threat of immediate foreclosure if Plaintiff could not comply. Shortly after acquiring the Property, Cognata installed a brand new roof. The timing of that renovation is illuminating: South Carolina Secretary of State records show that Cognata formed **Landvest Construction LLC** on September 22, 2017 --- one month after the second fraudulent loan closing in August 2017 and five years before the eviction. A predatory lender who forms a construction company the month after closing a fraudulent mortgage on a family's home had planned the acquisition from the beginning. A party who engineers an insurance cancellation to pressure a financially vulnerable borrower into obtaining emergency replacement coverage under threat of foreclosure, then installs a new roof on that same property after acquiring it through fraudulent proceedings, does not get to simultaneously claim the property lost $100,000 in assessed value. This coordinated sequence --- recommended insurer, manufactured cancellation, forced emergency expense, new roof at Plaintiff's direct cost --- an out-of-pocket expense Plaintiff personally paid, not an amount added to her loan --- reflects the involvement of additional participants in the enterprise and constitutes additional predicate acts of wire fraud and extortion. Additionally, following the eviction, windows on the Property were observed boarded up, suggesting possible structural or water damage resulting from Cognata's failure to maintain the drainage system at the rear of the Property --- a drainage maintenance requirement Plaintiff had managed throughout her occupancy and of which Cognata had no knowledge.

62. The area surrounding Plaintiff's former Property is now being actively developed, confirming that the enterprise's targeting of her specific parcel of land was not random. Plaintiff's Property at 110 Kennerly Road is located within the 29112 zip code, the same zip code identified in Orangeburg County's July 2024 rezoning approval granted to Wilderland Development LLC for

a new residential subdivision on Kennerly Road itself, with hundreds of new single-family homes planned for the same rural corridor where Plaintiff's family land was located. The broader economic transformation of this corridor is documented in public records and government filings: the South Carolina Department of Transportation's Carolina Crossroads project --- one of the largest construction ventures in South Carolina --- is actively widening approximately 11 miles of I-26 from four to six lanes, from exit 125 to exit 136, including full reconstruction of the exit 129 interchange, with construction beginning in mid-2024. Exit 129 is located within the same general area as Plaintiff's Property. The Sandy Run Industrial Park, positioned at Highway 21 and I-26, is a 760-acre development potentially spanning nearly 6 million square feet. Current and recent occupants include Amazon, Starbucks, Nephron Pharmaceuticals, and Zeus Industrial. Blanchard Machinery's $65 million Caterpillar parts and service plant is under construction on a 62-acre site and is expected to open in 2026. The area is strategically positioned between the Port of Charleston and the Columbia metropolitan area, making it a focal point for large-scale logistics and manufacturing. Multiple large residential subdivisions are in planning or active development in the Gaston and Sandy Run areas to meet housing demand created by industrial growth. Public reporting documents that investors specifically target properties in foreclosure or with delinquent taxes in this corridor because of the I-26 expansion, hoping to acquire land before values spike. Defendant Cognata has been publicly quoted bragging about acquiring land cheaply at tax sales --- a method that aligns precisely with this documented regional pattern. A Master-in-Equity who owns land throughout Calhoun County, presides over tax sales in that county, maintains a private law practice, and has a professional network that includes local attorneys and developers --- and who presided over Plaintiff's foreclosure while this transformation was unfolding around her property --- cannot credibly claim that his refusal to

recuse was without consequence. The current estimated market value of Plaintiff's former Property, according to public real estate records, is approximately $259,867 to $315,200. A comparable manufactured home on a similar lot in the same area sold on March 13, 2026 for $262,000. Cognata acquired Plaintiff's Property at his own rigged sale for $56,745 --- paying himself with Plaintiff's own equity --- and collected approximately $1,434 per month in rent from the Property for approximately 37 months following the eviction, for an estimated total rental income of over $53,000. The difference between what Cognata paid and the Property's current market value represents over $200,000 in stolen equity --- on top of the rental income collected from property that was never rightfully his. The extraordinary lengths to which the enterprise went to acquire Plaintiff's specific parcel of land are fully comprehensible in light of this documented development activity. Plaintiff possesses published evidence confirming Cognata's statements about cheap land acquisition at tax sales. Exhibit LL documents the SCDOT Carolina Crossroads project, the Sandy Run Industrial Park development, the Wilderland Development LLC Kennerly Road rezoning, and the regional development pattern surrounding Plaintiff's former Property.

## L. Cognata's Documented Pattern of Lawlessness

63. Benjamin Cognata is not an isolated bad actor who made an isolated mistake. He is a serial, documented predator who operates outside the law as a matter of practice, openly, and without consequence.

64. Cognata operates through seven to eight limited liability companies simultaneously. At any given time, he has numerous simultaneous open court cases in South Carolina courts across multiple counties. This level of litigation is not the byproduct of ordinary business --- it is the mechanism of the enterprise: file, foreclose, acquire.

**65.** During the COVID-19 pandemic, when the Governor of South Carolina instituted a moratorium on residential evictions to protect vulnerable tenants from homelessness during a public health emergency, Cognata sent a memo to his tenants demanding payment of rent or eviction --- issued just three days after the moratorium went into effect. This notice went viral on Twitter, generating widespread public outrage. Cognata sent that exact same memo to Plaintiff during active litigation against her --- a communication designed to intimidate and harass a litigant he was actively adverse to in court.

**66-A.** The enterprise's retaliation extended beyond Plaintiff to her fiancé and co-parent, Shartier Warren. On at least one occasion, Calhoun County Sheriff's deputies arrived at the Property at night, drew their weapons, pulled Shartier from his vehicle at gunpoint in front of the children, arrested him, and transported him to jail. A lieutenant subsequently called and ordered the deputies to return Shartier home --- he was released within hours. The arrest had no legitimate legal basis from the moment it was made, as confirmed by the lieutenant's immediate order to release him. On a subsequent occasion, Shartier was arrested for alleged traffic violations and held for approximately 60 days. Plaintiff and Shartier spent approximately $10,000 on attorneys to secure his release from incarceration for traffic violations. These targeted arrests of Plaintiff's household member, carried out by the same Calhoun County law enforcement apparatus overseen by Defendant Graham and Calhoun County, constitute retaliatory conduct against Plaintiff's household for her refusal to abandon her legal claims, and are independently actionable as civil rights violations under 42 U.S.C. § 1983. Shartier Warren intends to file his own federal RICO complaint against the same enterprise following the filing of this action. The two actions will constitute related cases involving the same defendants, the same enterprise, and

overlapping predicate acts --- further demonstrating the breadth and continuity of the enterprise's pattern of racketeering activity.

**66-C.** In the Order Denying Defendant's Motions for Stay (Exhibit L), entered February 10, 2023 --- days before Plaintiff and her child were put on the street --- Banks wrote that Plaintiff, a pro se litigant fighting documented fraud, had "managed to, in effect, delay these proceedings, for more than 30 days simply by filing frivolously" (Exhibit L). A judge who should never have been on this case, who had been Plaintiff's personal attorney on the same property, who had no valid oath of office, who had directed opposing counsel to draft his orders by personal Gmail, called Plaintiff's legitimate constitutional arguments frivolous. This characterization is itself evidence of bias and is further proof that no impartial adjudication ever occurred in these proceedings.

**66-D.** As early as July 17, 2020 --- while Plaintiff was still living at the Property and the litigation was still ongoing --- Cognata's property management software (ManageBuilding.com) was already designating 110 Kennerly Road as a rental property under the tag "LOAN TO LANDVEST HOLDINGS I LLC" (Exhibit X) and sending insurance update demands as though Plaintiff were a tenant, not the owner. This communication (Exhibit X) was forwarded to Plaintiff by a third party named Courtney Baltzegar who had received it. Cognata was operating Plaintiff's home as a rental unit in his property management system before any court had authorized his possession. This is evidence that Cognata viewed the property as already his during the litigation and demonstrates the bad faith and premeditation underlying the entire scheme.

**66-E.** The property tax records of Calhoun County document the fraudulent devaluation in precise numbers. The assessed value of 110 Kennerly Road was $117,400 in 2020 (Exhibit R) ---

the year before Cognata took the property. In 2021, the year of Cognata's acquisition, the assessed value was reduced to $4,700 --- a 96% collapse in a single year, from $117,400 to $4,700. By 2022 it remained $4,700. By 2024 it had risen only to $3,970. A property where Cognata installed a new roof, placed paying tenants, and maintained occupancy throughout does not lose 96% of its assessed value. The documented tax record is attached as Exhibit R and proves the coordinated devaluation.

**66-F.** The Mr. Mortgage Residential Mortgage Broker Contract, signed by DC Terry, states in its REPRESENTATION clause: "I do not have an agency relationship with any other person" (Exhibit V). By signing this contract, DC Terry certified under South Carolina law that he represented Plaintiff exclusively and owed her "a duty of the utmost care, honesty, and loyalty, including full disclosure of all material facts." He then appeared at trial and testified on behalf of Cognata against Plaintiff --- the client to whom he had contractually certified his exclusive loyalty. This contract (Exhibit V), which is in Plaintiff's possession, constitutes per se proof of breach of fiduciary duty and fraudulent misrepresentation.

**66-G.** The South Carolina Department of Revenue was inserted as a named defendant in Case 2021-CP-09-00174 for alleged tax liens (Exhibit AA) that Plaintiff contests were not legitimately hers. This insertion --- of a state agency as a co-defendant alongside a homeowner who was already fighting a predatory foreclosure --- added additional procedural complexity and pressure to proceedings that were already structurally compromised by the conflicted presiding officer.

66-H. The cascading financial consequences of Cognata's manufactured double payments began immediately. Within months of the double billing beginning in late 2017, Plaintiff and her family went without electrical power for approximately ten months. They lost both vehicles. These losses --- vehicles and electrical power --- all flow directly and foreseeably from Cognata's

decision to double the debt obligation without disclosure or consent. During the illegal arrest of Shartier Warren, the officers handcuffed him so tightly that the restraints cut into his wrists, drawing blood. This occurred in front of the couple's children and their children's friends who were present at the time. Shartier Warren appeared before both Judges Bloom and Teague in proceedings arising from the same retaliatory arrest pattern. Most significantly: Judge Bloom presided over at least one case in Calhoun County in which Defendant Banks himself was the plaintiff --- representing himself in his personal capacity --- while Banks's own law partner, Neumeister, represented the defendant. This arrangement --- a sitting judge presiding over a case in which the county Master-in-Equity is the opposing plaintiff and the Master-in-Equity's private law partner is defense counsel --- is the complete corruption of the judicial process. Bloom, Teague, and Banks operated as an interlocking judicial network in which each protected the others' interests and ensured that no litigant challenging any member of the network could obtain a fair hearing in Calhoun County. The South Carolina Department of Consumer Affairs was simultaneously investigating numerous complaints against Cognata across multiple counties --- and then dropped every investigation without enforcement action. Cognata has been allowed to operate with impunity because of the network of institutional protection described throughout this Complaint.

## M. The Retaliatory Custody Case and Illegal Arrest

67. After the eviction in February 2023, the father of Plaintiff's minor son Koy brought a custody dispute. The matter was assigned to Defendant Judge Mandy Kimmons. At the time she presided over the case, Judge Kimmons's husband was employed by the same company as the opposing party --- Tim Stanfield --- in the custody case. Kimmons disclosed this conflict of interest at the outset of the hearing. Plaintiff's attorney did not object and the proceedings continued.

Notwithstanding this disclosure, Kimmons failed to recuse herself as required. Most significantly: when Plaintiff arrived at the courthouse for the hearing, Defendant Lieutenant Stanley Graham was already inside the courtroom standing with Kimmons in conversation when Plaintiff entered. Plaintiff witnessed this conversation directly upon entering. Graham had no legitimate business in that courtroom --- he was not a party, not a witness, and had not been summoned. He had numerous unresolved complaints pending against him filed by Plaintiff arising directly from the eviction just months earlier. His undisclosed pre-hearing communication with the presiding judge before the hearing began constituted ex parte communication between a law enforcement officer with direct personal animus toward Plaintiff and the judge who would moments later sentence Plaintiff to jail. At the conclusion of the hearing, Graham was the officer who approached Plaintiff to place her in handcuffs. He appeared eager to do so. When Plaintiff raised her arms, he became visibly angry, handed the cuffs to another officer, and left the room. The same officer who destroyed Plaintiff's possessions, threatened her arrest, and called her "stupid" in front of her mother had been standing in undisclosed communication with the judge who then jailed her.

**68.** Plaintiff declined to send her young son for a visitation weekend after the child disclosed that his father had been drinking beer while driving with him, and after Koy was placed in danger during an poorly supervised river activity involving alcohol. Plaintiff acted to protect her child from documented danger --- conduct that is not only lawful but required of a responsible parent.

69. Kimmons presided over the resulting contempt hearing with open hostility toward Plaintiff. She refused to allow any of Plaintiff's witnesses to testify. She imposed a sentence of thirty days in jail --- a punishment grossly disproportionate to the alleged conduct and legally unsupportable given the circumstances. She failed to conduct a mandatory ability-to-pay hearing before

imposing a sentence conditioned on payment of $2,300 in attorney fees owed to opposing counsel Attorney Felder --- a member of the same Calhoun County legal network as Banks and Graham, whose presence in the proceedings created an additional undisclosed conflict. Plaintiff served six days in a janitor's closet at the Orangeburg County Detention Center with five other women, on the floor, with inadequate food and no access to natural light. She was released only when her adult daughter obtained a statement confirming payment of the $2,300 attorney fee demand and delivered it to the jail. Plaintiff's daughter --- not Plaintiff --- was forced to pay the opposing party's attorney fees to free her mother from an unconstitutional imprisonment. In addition, Plaintiff had already paid $2,500 to her own retained attorney for representation at that same hearing --- an attorney who failed to raise the mandatory ability-to-pay hearing requirement, failed to protect Plaintiff's right to call witnesses, and allowed the unconstitutional imprisonment to proceed without objection. Plaintiff therefore paid a total of $4,800 in attorney fees in direct connection with this unconstitutional contempt proceeding --- $2,500 to her own attorney who failed her, and $2,300 through her daughter to opposing counsel as the price of her freedom --- not a single dollar of which was lawfully owed. The $2,300 Plaintiff was ordered to pay was not restitution, not a debt she owed, and not the product of any ability-to-pay analysis. It was attorney fees for opposing counsel, ordered paid under threat of imprisonment, by a judge who should never have been on the case.

70. This arrest was illegal. This imprisonment was unlawful. A parent who takes good-faith action to protect her child from harm cannot be constitutionally imprisoned for that action, particularly without being permitted to present witnesses or evidence in her own defense. Plaintiff was taken directly from the courtroom to the jail facility without any opportunity to contact her family or make arrangements for her son Koy. Family members had to take

last-minute time off from work with no warning because they could not be reached in advance. Plaintiff was unable to reach anyone for days. Koy was left without his primary caregiver and homeschool teacher with no notice whatsoever --- a disruption that was entirely unnecessary and entirely preventable had due process been followed. Koy's belongings were left at the location of the custody exchange with no arrangements made for their retrieval. Most significantly, Koy witnessed his mother being handcuffed and taken away by law enforcement at the courthouse --- immediately after the trauma of losing his home, his possessions, and his stability. This experience left him confused, frightened, and afraid of law enforcement. A child who watched officers destroy his home and then watched those same officers take his mother away in handcuffs carries that fear. It did not have to happen this way.

## N. Exhaustion of State Remedies and Denial of Access to Justice

71. Before filing this action, Plaintiff exhausted every available state and federal administrative remedy. She was dismissed, ignored, or turned away at every door. The following agencies and bodies received complaints from Plaintiff and failed to act:

• **(i)** United States Department of Justice --- no substantive response

• **(ii)** Federal Bureau of Investigation --- no substantive response

• **(iii)** Civil Rights Division, United States Department of Justice --- no substantive response

• **(iv)** South Carolina Attorney General --- dismissed

• **(v)** South Carolina Judicial Commission --- dismissed

• **(vi)** South Carolina Commission on Judicial Ethics --- dismissed

• **(vii)** South Carolina Bar Association --- dismissed

• **(viii)** South Carolina Department of Consumer Affairs (Kenneth Middlebrook, Bryon Gibbs) (Exhibit BB) --- initially engaged, then dropped all investigations without explanation

• **(ix)** South Carolina Board of Financial Institutions --- issued Cease and Desist but took no further enforcement action against Cognata despite his continued violations

72. In addition to administrative exhaustion, Plaintiff contacted more than one hundred licensed attorneys seeking legal representation. Every single attorney declined --- not on the merits, but because the case involved a sitting judge. This is not speculation; attorneys told Plaintiff directly that the involvement of Judge Banks made the case untouchable. The practical consequence of judicial involvement in a predatory scheme is that the victim is denied access to counsel, denied access to the courts, and left entirely without recourse.

73. This is not a failure of any single institution. It is a systemic failure --- the predictable result of a deeply embedded network in a small South Carolina county, where the Master-in-Equity has presided for approximately twenty years with no valid oath of office on file at the Calhoun County Courthouse. Plaintiff personally visited the courthouse and was unable to locate any oath of office for Banks. Staff stated that records were being moved and suggested she check back. Plaintiff also submitted a written request to the South Carolina Secretary of State requesting Banks's oath of office and received no reply. Banks no longer resides in the county he presides over, operates a simultaneous private law practice, owns land throughout the county he rules, and whose professional network includes the attorneys, officials, and developers who stand to benefit from the acquisition of undervalued rural land.

74. Federal intervention is not merely appropriate --- it is the only available remedy. Every state avenue has been tried and has failed. This Court is the last recourse for justice.


## SECRETARY OF STATE REQUEST --- OATH OF OFFICE

Plaintiff submitted a written request to the South Carolina Secretary of State requesting the filed oath of office for Master-in-Equity Martin R. Banks as required by S.C. Code Ann. Section 14-11-20 and S.C. Const. Art. VI, Section 5. No response was received. The Secretary of State's failure to produce this constitutionally mandated public record raises the legal inference that no valid oath exists or was ever filed. S.C. Code Ann. Section 8-3-10 makes it unlawful for any person to assume the duties of any public office without first taking the oath required by the Constitution. Every order signed by Banks during Plaintiff's proceedings was therefore issued unlawfully --- not merely voidably, but unlawfully --- under the plain text of state law. This independently strips any claimed judicial immunity and renders every act performed by Banks during these proceedings void ab initio.

## O. The Human Cost

**75.** This Complaint contains legal claims, statutory citations, and procedural arguments. Pamela Brown started this ordeal trying to save the land her family had sacrificed to own. She ended it homeless, in poverty, with every possession she had accumulated over fifteen years destroyed in a rainstorm, her son Koy Hutto sleeping wherever they could, and her family broken apart.

**75-A.** Koy was eight years old when the eviction happened. His birthday is in December. The eviction came in February --- but the belongings destroyed in the storm included all of his Christmas gifts and all of his birthday presents. In a single weekend, a child lost everything he owned and everything he had just received. He was then dragged from house to house for months with nowhere stable to live, no bedroom of his own, no home to return to. Koy had attended kindergarten and first grade before Plaintiff began homeschooling him after COVID. That homeschool education --- the stable, consistent learning environment Plaintiff had built for

him --- was thrown into chaos along with everything else. He lost his home, his possessions, his stability, his routine, and his sense of safety in a single weekend because of the decisions of adults who knew exactly what they were doing.

**75-B.** The custody proceedings that followed compounded this harm in ways that are difficult to fully describe. Koy spent his entire life being raised by Plaintiff and by her fiancé --- the man Koy calls his father, who has been present for him in every meaningful way. The custody case forced Koy into a relationship with a biological father who had no involvement in his life and whom Koy did not know as a parent. A court presided over by a conflicted, unrecused judge granted that absent party rights over a child he had not raised --- while simultaneously jailing the mother who had raised him, homeschooled him, protected him, and sacrificed everything for him. The man who raised Koy was sidelined. The man who never showed up was handed court-ordered access. This is not a custody dispute gone wrong. This is a child whose entire world was dismantled by a system that did not care what happened to him.

**76.** She fought alone. She taught herself law from scratch while raising her child, managing poverty, and coping with the trauma of watching her home taken by the very system that was supposed to protect her. She appeared in court without counsel, filed briefs by hand from a shed without internet access, and homeschooled her son through years of chaos and displacement. Every attorney she contacted declined. Every agency dismissed her. The man responsible went viral on social media bragging about evictions during a pandemic and is quoted in the newspaper bragging about acquiring land at tax sales --- and he is still operating, still filing numerous cases, still acquiring properties.

77. Ms. Brown and her son Koy are currently in poverty. They are barely getting by. Eight years have passed since this began. This Court has the authority and the obligation to remedy what every other institution has failed to address.

## V. THE RICO ENTERPRISE

78. At all relevant times, Defendants constituted and operated as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) --- an ongoing association-in-fact engaged in activities affecting interstate commerce through mortgage lending, real estate transactions, court filings transmitted through the mails and wires, and coordinated financial arrangements crossing state lines.

79. The Enterprise consisted of the following members, each playing a defined role:

**Illegal Lending and Servicing Entities:** SC Home Holdings, LLC and Landvest Holdings I, LLC — the unlicensed shell companies through which Cognata originated and serviced the fraudulent dual mortgages; both subject to BOFI Cease and Desist Orders (Exhibit G).

**Individual Lenders and Financial Actors:** Benjamin Cognata — architect and controlling member of the enterprise; Damon C. Terry Sr. / Mr. Mortgage, LLC — mortgage broker who certified exclusive loyalty to Plaintiff in writing then testified against her at trial; and other unknown participants operating in financial facilitation roles.

**Attorneys and Legal Facilitators:** Dennis Wayne Catoe — Cognata's personal attorney, closing attorney on both loans, and notary on the forged deed, who additionally testified against Plaintiff at trial; Mary M. Caskey / Haynsworth Sinkler Boyd, P.A. — drafted Banks's orders at his direction by personal Gmail, transmitted the corrupt settlement offer, and testified the SC Home Holdings loan did not exist; Rob Thuss — accepted a financial kickback of $2,500 from the opposing party while urging Plaintiff to sign away all her rights for zero consideration; Palmetto

Title & Escrow Company — closing venue for both fraudulent transactions; Dawn Hammond — witness on the forged deed; Don Hammond — participated in correspondence about the forged deed.

**Judicial Participants:** Martin R. Banks — Master-in-Equity who served as Plaintiff's prior attorney on the same property, refused recusal, directed opposing counsel through personal Gmail to draft his orders, and entered every dispositive order without valid jurisdiction or oath of office; Judge Mandy Kimmons — jailed Plaintiff without ability-to-pay hearing, no witnesses allowed, undisclosed conflict of interest, resigned before proceedings concluded; Judges Bloom and Teague — interlocking judicial network protecting the enterprise from challenge.

**Law Enforcement Participants:** Lieutenant Stanley Graham — facilitated the destructive eviction, made false assurances about delay of enforcement, refused to witness property destruction, threatened arrest, held ex parte communications with Kimmons before the custody hearing, and participated in retaliatory arrest patterns against Plaintiff's household.

**Government and Administrative Participants:** Calhoun County Property Assessor — coordinated the 96% collapse in assessed property value in the year of Cognata's acquisition; Clerk of Court — facilitated the fraudulent alteration of the public record showing the vacated foreclosure as "satisfied"; Calhoun County — liable under Monell through deliberate indifference to constitutional violations by its officials; and other unknown participants in administrative facilitation roles.

**80.** The Enterprise's purpose was to identify financially vulnerable property owners in South Carolina --- particularly those with equity-rich land and limited legal resources --- issue them unlicensed, fraudulently documented mortgage loans with hidden terms, use a corrupted state court system to foreclose on those properties when payments were impossible, acquire the

properties at controlled prices below market value, pocket the equity, reduce assessed values through complicit county officials to minimize tax liability, and repeat the scheme. The area's subsequent development confirms the strategic, financially motivated nature of the land acquisition.

81. The Enterprise used the United States mails and interstate wire communications to transmit loan documents, the forged deed, foreclosure pleadings, court orders, eviction notices, and financial wire transfers --- each constituting predicate acts of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343. The Enterprise operated continuously from at least 2017 through the present, involving multiple victims and spanning the full duration of both state court cases.

## SOUTH CAROLINA TORT CLAIMS ACT --- EXCLUSION FOR WILLFUL MISCONDUCT

To the extent any Defendant seeks to invoke governmental immunity under the South Carolina Tort Claims Act, S.C. Code Ann. Section 15-78-10 et seq., that defense is unavailable here. The Act expressly excludes from immunity coverage any act or omission of a governmental employee that constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude. S.C. Code Ann. Section 15-78-60(17). Each county Defendant --- including the Calhoun County Sheriff's Office, the Property Assessor, and the Clerk of Court --- engaged in documented willful misconduct: manufacturing a 96% collapse in assessed property value in the year of acquisition; altering public records to show a vacated foreclosure as satisfied; and conducting ex parte communications with adverse parties. These acts fall squarely within the

statutory exclusion. Governmental immunity does not shield willful misconduct, fraud, or criminal acts regardless of the actor's official capacity.

## V-A. LEGAL AND EQUITABLE FOUNDATIONS: WHY THIS COMPLAINT SURVIVESDISMISSAL

This section is presented proactively to address the legal doctrines and affirmative defenses Defendants are expected to raise in motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), and to establish the equitable, jurisprudential, and common-law foundations upon which every Count rests. The Court is respectfully asked to read each Count in light of the principles set forth herein.

### A. Preemptive Response to Rooker-Feldman

**82.** Defendants will likely argue that this Court lacks jurisdiction to consider claims arising from state court judgments under the Rooker-Feldman doctrine. That argument fails here for the following reasons.

**83.** The Rooker-Feldman doctrine is narrow. It bars only suits brought by state court losers "complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The Supreme Court has repeatedly emphasized that Rooker-Feldman does not bar claims that are "independent" of the state court judgment, even if those claims are related to the same underlying dispute. *Id.* at 293.

**84.** Plaintiff is not asking this Court to reverse or modify the state court judgments. Plaintiff asserts independent federal constitutional claims --- under RICO, 42 U.S.C. § 1983, and federal lending statutes --- arising from Defendants' fraudulent conduct that pre-dated, surrounded, and

infected those proceedings. The injury here is not the state court judgment itself; it is the forged deed, the unlicensed lending, the predatory loan structuring, the bribery of Plaintiff's own attorney, the destruction of Plaintiff's property, and the unconstitutional conduct of state officials acting under color of law. These are independent federal injuries. *Skinner v. Switzer*, 562 U.S. 521, 532 (2011); *Lance v. Dennis*, 546 U.S. 459, 463 (2006).

**85.** Moreover, where state court proceedings were themselves procured by fraud --- including fraud upon the court and the participation of a disqualified judicial officer --- those proceedings are void and cannot serve as a jurisdictional barrier to federal relief. A void judgment is not a judgment at all. *Pennoyer v. Neff*, 95 U.S. 714, 732--33 (1877). Rooker-Feldman does not protect void orders.

### B. Preemptive Response to Judicial Immunity

**86.** Defendants Banks and Kimmons will likely assert absolute judicial immunity. That doctrine does not shield either of them here.

**87.** Judicial immunity is absolute only for acts taken in a judicial capacity and only when the judge had jurisdiction over the matter. *Stump v. Sparkman*, 435 U.S. 349, 356--57 (1978). Immunity fails in two circumstances: (1) when the judge acts in the "clear absence of all jurisdiction," and (2) when the act, though within jurisdiction, is not a judicial act at all. *Mireles v. Waco*, 502 U.S. 9, 11--12 (1991).

**88.** As to Banks: A judge who has a prior attorney-client relationship with a party to the litigation before him --- on the identical subject matter at issue --- is constitutionally and ethically required to recuse. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876--77 (2009). His refusal to do so did not merely create a voidable conflict; it stripped him of jurisdiction entirely. The constitutional guarantee of an impartial tribunal is not a preference --- it is a jurisdictional

prerequisite. *In re Murchison*, 349 U.S. 133, 136 (1955). Furthermore, Banks's conduct of directing opposing counsel to draft orders, coordinating case outcomes through personal email communications outside the formal record, and accepting lobbying from opposing counsel against pending motions constitute acts that are not judicial in nature --- they are acts of coordination with a party to litigation. Immunity does not attach to non-judicial acts regardless of whether they occur in a judicial context.

**89.** Banks additionally entered a judgment lien foreclosure order as Master-in-Equity --- a proceeding outside the equitable jurisdiction of that office under South Carolina law. An act taken outside all subject matter jurisdiction is not a judicial act entitled to immunity. *Stump*, 435 U.S. at 357 n.7.

## DERIVATIVE ILLEGITIMACY AND MINISTERIAL DUTY FAILURES

Because the foreclosure proceedings were void ab initio --- initiated by unlicensed entities operating under active Cease and Desist Orders, presided over by a disqualified judicial officer without a valid filed oath of office, and executed through forged instruments bearing a deceased person's signature --- the illegitimacy of those proceedings is derivative. Every act taken in furtherance of void proceedings carries no legal validity regardless of which defendant performed it. No defendant may claim immunity, protection, or legal standing derived from participation in proceedings that had no lawful existence from their inception. As courts have long recognized: void things are as no things. Marden v. Dorthy, 160 N.Y. 39 (1899).

Defendants additionally may not claim immunity for failures to perform mandatory ministerial duties. The filing of a constitutional oath of office, mandatory recusal upon recognition of a disqualifying conflict, maintenance of official court records through official channels, and lawful execution of valid --- not void --- court orders are each ministerial in nature, admitting of no judicial discretion. Immunity does not attach to ministerial failures regardless of whether they are committed by judicial officers. Forrester v. White, 484 U.S. 219, 227-29 (1988). Defendants Banks and Graham each failed mandatory ministerial duties in ways that directly caused Plaintiff's constitutional injuries. Those failures are independently actionable and independently strip any claimed immunity.

90. As to Kimmons: Kimmons was a former South Carolina state representative who resigned from that elected position early, before this case arose. She was subsequently rezoned into Plaintiff's judicial district despite having no prior knowledge of or familiarity with Plaintiff's circumstances, and conducted no investigation into Plaintiff's background or case before presiding. She has a documented pattern of imposing incarceration sentences against mothers conditioned on payment of opposing counsel's attorney fees, and has been publicly listed on the South Carolina Judges Wall of Shame. She presided over a contempt matter while her husband was employed by the same company as the opposing party --- a disclosed conflict that nonetheless required recusal under the South Carolina Rules of Judicial Conduct. Additionally, South Carolina Secretary of State records confirm that Kimmons is the registered agent of **206 Ocean #220 LLC** (Entity ID 00971589), a domestic limited liability company currently in Good Standing, registered at 108 Sullivans Landing Road, Ridgeville, South Carolina. The name "206 Ocean #220" is consistent with a real estate property address, indicating this is a real estate

holding entity. Kimmons actively maintained this real estate LLC --- filing a Notice of Change of Registered Agent Address as recently as December 8, 2023, ten months after she jailed Plaintiff --- while simultaneously presiding over Plaintiff's family court contempt matter. The South Carolina Code of Judicial Conduct requires disclosure of any financial interest that could reasonably cause a party to question the judge's impartiality, regardless of the subject matter of the proceeding. This interest was never disclosed. This conflict was never disclosed to Plaintiff and Plaintiff was never given the opportunity to seek recusal on this basis. Her failure to recuse, her refusal to allow Plaintiff to call any witnesses, and her imposition of a thirty-day incarceration sentence without conducting a mandatory ability-to-pay hearing all corroborate that her conduct exceeded the bounds of proper judicial authority. Immunity does not shield conduct taken without jurisdiction or in the total absence of due process. *Pulliam v. Allen*, 466 U.S. 522, 536 (1984).

## C. RICO Pleading --- Pattern, Continuity, andEnterprise

**91.** To plead a viable RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Each element is satisfied here.

**92.** Enterprise: An association-in-fact enterprise requires only "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Defendants here --- Cognata, his shell companies, the closing attorneys, the mortgage broker, the judicial officer, and county officials --- operated as exactly such an association, with defined roles, a common purpose (property extraction), and continuing function over multiple years and multiple victims.

**93.** Pattern: A "pattern of racketeering activity" requires at least two predicate acts that are related and continuous. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239--40 (1989). Here, the predicate acts span from 2017 to the present, involve multiple victims across multiple counties, and are committed through an enterprise that continues to operate through numerous ongoing court cases. Both closed-ended and open-ended continuity are established.

**94.** Specificity of Predicate Acts: Wire fraud and mail fraud as RICO predicates require pleading with particularity under Federal Rule of Civil Procedure 9(b). Plaintiff satisfies this standard: the wire fraud includes the August 17, 2017 wire transfer of $18,000 that conflicted with the $25,000 Note and $35,000 Mortgage executed the same day at Palmetto Title & Escrow, Columbia, South Carolina, transmitted through interstate wire by Defendants Cognata, Landvest Holdings, and Catoe. The mail fraud includes the transmission of forged deed instruments, fraudulent loan documents, and inflated billing statements through the United States mails.

## D. Statute of Limitations --- Tolling Doctrines

**95.** RICO carries a four-year statute of limitations running from the date Plaintiff discovered, or through reasonable diligence should have discovered, her injury. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). Three independent doctrines toll or restart that period here.

**96.** First, fraudulent concealment: Defendants actively concealed: the forged deed; the unlicensed status of the lender; Banks's prior attorney-client relationship with Plaintiff; Kimmons's husband's conflict of interest; DC Terry's loyalty to the opposing party; the inflation of the debt; and the fraudulent alteration of public court records to show "satisfied" rather than "vacated." Plaintiff could not have discovered the full extent of this concealment until documents became

available through the state court proceedings, the last of which concluded in February 2023. The limitations period is tolled through that date at minimum.

97. Second, the continuing violation doctrine: Each new predicate act --- each new court filing in the fraudulent proceedings, each new billing statement inflating the debt, the eviction in February 2023, the ongoing "pending" lis pendens --- restarts the limitations clock. The enterprise is ongoing. The harm is continuing.

98. Third, equitable tolling: Plaintiff is a pro se litigant in poverty who was denied access to counsel because of judicial involvement in the scheme and who pursued every available administrative remedy in good faith before filing this action.

### E. Section 1983 --- Private Actor Liability ThroughConspiracy

99. A private party who acts in concert with a state official to deprive a person of constitutional rights acts "under color of law" within the meaning of 42 U.S.C. § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). Where a private party conspires with a corrupt judge to enter void orders against a litigant, that private party is a state actor for § 1983 purposes. *Dennis v. Sparks*, 449 U.S. 24, 27--28 (1980). The use of state legal processes by private parties with the participation and protection of a conflicted judicial officer constitutes state action under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941--42 (1982).

100. Cognata, Caskey, and Thuss are private actors who used the state court system --- through a judicial officer they knew to be disqualified --- as the mechanism for extracting Plaintiff's property. Their conduct constitutes state action under *Dennis*, *Adickes*, and *Lugar*. They are properly named as § 1983 defendants.

### F. Municipal Liability --- Monell and Calhoun County

**101.** A municipality is liable under 42 U.S.C. § 1983 where: (1) a constitutional deprivation was caused by a governmental custom, policy, or practice; or (2) a final policymaker made a decision that itself constitutes official policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

**102.** The Master-in-Equity for Calhoun County is a final policymaker for county judicial functions. Banks's decisions in both foreclosure cases --- entered without jurisdiction, in knowing disregard of his conflict of interest --- constitute official county policy under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). The County's failure to maintain oversight of a judicial officer operating without a valid oath of office, who no longer resides in the county, who simultaneously operates a private law practice, and who has extensive property and financial interests within the county he presides over, constitutes deliberate indifference to the constitutional rights of litigants. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Calhoun County is liable under Monell.

### G. Fraud Upon the Court --- No Statute of Limitations

**103.** Fraud upon the court carries no statute of limitations and may be raised at any time in any proceeding. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244--46 (1944). Fraud upon the court includes the submission of forged documents, perjured testimony, and the corruption of the judicial process through a conflicted judicial officer. The fraudulent alteration of the public court record --- showing the vacated foreclosure as "satisfied" (Exhibit M) --- is fraud upon the court and upon the public. Caskey testified under oath that the SC Home Holdings loan did not exist --- a statement directly and conclusively contradicted by the mortgage documents, billing statements, and bank wire records in Plaintiff's possession. Cognata likewise testified under oath that the SC Home Holdings loan did not exist. Cognata further testified under oath that Plaintiff had approached him requesting a loan of one hundred thousand

dollars, that he declined because he could not accommodate that amount, and that Plaintiff became angry as a result. This fabricated narrative --- invented under oath before the court --- was designed to reframe Plaintiff as an aggressive, unreasonable borrower rather than a fraud victim. It is directly contradicted by every document in the record. Catoe, who served simultaneously as Cognata's personal attorney, the closing attorney for both loan transactions, and the notary on the forged deed, also testified at trial on behalf of Cognata against Plaintiff --- despite having been present as her closing attorney at the very transactions at issue. Three witnesses --- Caskey, Cognata, and Catoe --- each made statements under oath in these proceedings that are demonstrably false and constitute perjury and fraud upon the court. There is no time bar on these claims.

## H. Void Judgment Doctrine

104. A judgment entered by a court without jurisdiction is void --- not merely voidable --- and may be attacked at any time. *Pennoyer v. Neff*, 95 U.S. 714, 732--33 (1877). Because Banks lacked jurisdiction --- both because of his mandatory recusal and because of his excess of subject matter jurisdiction in the judgment lien proceeding --- every order he entered in both cases is void ab initio. A void judgment creates no rights, bars no claims, and provides no res judicata effect. *Kalb v. Feuerstein*, 308 U.S. 433, 438 (1940).

105. This is not a collateral attack on a valid judgment. This is a direct assertion that there was never a valid judgment to attack.

## I. The Maxims of Equity

### J. The Monroe v. Pape Foundation --- Why Federal Courts MustAct

116. The Supreme Court held in *Monroe v. Pape*, 365 U.S. 167, 174 (1961), that 42 U.S.C. § 1983 was enacted specifically to provide a federal remedy in cases where state courts or state

institutions were either unwilling or unable to enforce federal constitutional rights. This case is precisely what *Monroe v. Pape* anticipated. The state court system in Calhoun County, South Carolina was used as the enterprise's primary enforcement instrument. The state bar failed. State agencies failed. Every attorney declined. Section 1983 was enacted by Congress precisely to provide a federal remedy where state institutions have failed to enforce federal constitutional rights. This case is exactly what that statute was designed to address.

## K. The Anti-Injunction Act Does Not Bar Relief

117. The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from enjoining state court proceedings except in three circumstances: (1) as expressly authorized by Act of Congress, (2) where necessary in aid of jurisdiction, or (3) to protect or effectuate the court's judgments. All three exceptions apply here. RICO expressly authorizes injunctive relief under 18 U.S.C. § 1964(a). The void nature of the state court orders --- entered without jurisdiction --- means there are no valid state proceedings to protect. And once this Court assumes jurisdiction, an injunction is necessary to protect its jurisdiction against ongoing enterprise conduct.

## L. Plausibility --- Twombly/Iqbal Standard Is Met

118. Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

119. This Complaint meets and exceeds that standard. Every element of every count is supported by specific, documented facts: named parties; specific dates; specific documents (the forged deed, the BOFI Cease and Desist, the wire transfer, the HUD statements, the settlement offer); specific acts (the same-day deed transfer, the pandemic moratorium violation, the "satisfied" public record entry, the judge's personal Gmail instructions to opposing counsel to draft his

orders); and specific witnesses (Dawn Hammond, Catoe, DC Terry, Graham). The plausibility of a coordinated RICO enterprise is reinforced by the documented involvement of numerous victims across multiple counties, the public record of Cognata's numerous simultaneous court cases through multiple shell companies, and his published boasting about cheap land acquisition. This is not a complaint of conclusions. It is a complaint of facts.

## M. Inconsistent Rulings as Evidence of Bias andPredetermination

**119-A.** A pattern of inconsistent rulings that systematically favor one party against the weight of the evidence is itself evidence of judicial bias and predetermination. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Banks vacated the first foreclosure in February 2020 --- a ruling in Plaintiff's favor that acknowledged the legal deficiencies in the first case. Within months, the same judge presided over a second simultaneous case on the same debt, through the same conflicted posture, and entered every ruling against Plaintiff. He dismissed her constitutional arguments as "frivolous" (Exhibit L) while simultaneously directing opposing counsel by personal email to draft his own orders. He entered a consent order after acknowledging in writing that no consent existed. He denied a stay despite a pending appeal. Each of these inconsistencies, taken individually, might be explained. Taken together, they document a pattern of rulings calibrated not by law but by outcome --- the outcome being Cognata's acquisition of Plaintiff's property. Inconsistency in the application of legal standards, combined with documented ex parte communications and a disqualifying prior relationship, removes any presumption of impartiality.

## N. Least Restrictive Means --- Irreversible Enforcement WhenPreservation Was Available

**119-B.** Where a court has discretion in fashioning enforcement, due process and the principles of equity require that the court select the least restrictive means available --- particularly where the irreversible destruction of property rights is at stake. *Fuentes v. Shevin*, 407 U.S. 67, 90--91

(1972). Here, Banks had multiple less restrictive enforcement options available: he could have stayed the writ of assistance pending resolution of Plaintiff's appeal; he could have ordered a supervised inventory and storage of personal property before the eviction; he could have conditioned enforcement on a confirmation hearing given the appeal. Instead, with full knowledge that a violent storm had been publicly forecast for the eviction date, he chose the most destructive available option --- immediate forcible execution of the writ, with no supervision and no protection for Plaintiff's belongings. That choice was not neutral judicial administration. It was a deliberate selection of the enforcement mechanism most likely to ensure that Plaintiff lost everything and had no recourse.

## VI. CAUSES OF ACTION

All Counts incorporate by reference all preceding paragraphs as if fully set forth herein. The Counts are organized in four Parts, building from foundational federal lending law violations, through state law violations and civil rights claims, to the RICO counts that incorporate all prior violations as predicate acts.

## PART ONE: FEDERAL LENDING LAW VIOLATIONS

## COUNT I

## VIOLATIONS OF FEDERAL CONSUMER LENDING LAWS

*Truth in Lending Act (TILA) | Home Ownership and Equity Protection Act (HOEPA) | Real Estate Settlement Procedures Act (RESPA)*

*(Against Cognata, SC Home Holdings, Landvest Holdings, Catoe, DC Terry, and Palmetto)*

## Subcount A --- Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 etseq.

**120.** TILA requires creditors to disclose, before closing, the true annual percentage rate, total finance charge, total amount financed, payment schedule, right of rescission, and all material loan terms. 15 U.S.C. § 1638. Failure to provide required disclosures entitles a borrower to rescission for up to three years after consummation. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). Rescission voids the security interest and requires return of all money paid. *Jesinoski v. Countrywide Home Loans, Inc.*, 574 U.S. 259, 261 (2015). A borrower need only send written notice of rescission to exercise this right --- no lawsuit required. *Id.* TILA applies to any creditor who regularly extends consumer credit. 15 U.S.C. § 1602(g). An unlicensed lender who issues mortgage instruments through multiple shell companies "regularly extends credit" within the meaning of TILA. *Mims v. Dixie Fin. Corp.*, 426 F. Supp. 627, 631 (N.D. Ga. 1976).

**121.** Defendants violated TILA by: (a) failing to disclose the existence of two separate loan instruments through two separate entities; (b) presenting loan documents containing three irreconcilable principal amounts ($18,000 disbursed, $25,000 in the Note, $35,000 in the Mortgage) (Exhibits A, B, C); (c) failing to provide the mandatory three-day right of rescission notice for a non-purchase-money mortgage on Plaintiff's primary residence --- a right that entitles a borrower on a refinance or equity loan on her home to cancel the transaction within three business days of closing, which Defendants never disclosed or honored; (d) charging undisclosed fees including double closing costs, fees with no description, and a fabricated appraisal charge (Exhibit D); and (e) making material misrepresentations that prevented Plaintiff from making an informed credit decision. Plaintiff asserts TILA violations as a defense of recoupment, which is not time-barred. 15 U.S.C. § 1640(e).

**Subcount B --- Home Ownership and Equity Protection Act (HOEPA), 15U.S.C. § 1639**

122. HOEPA applies to high-cost mortgages and imposes heightened protections including mandatory disclosures, ability-to-repay analysis, and prohibition of abusive practices. The loans to Plaintiff qualify as high-cost under HOEPA based on the applicable APR and fee thresholds, given Plaintiff's documented income of $15,000 per year.

123. Defendants violated HOEPA by: (a) failing to assess Plaintiff's ability to repay; (b) charging points and fees exceeding applicable thresholds; (c) failing to provide required HOEPA disclosures at least three business days before closing; (d) inflating the loan balance far beyond the agreed amount without disclosure; and (e) engaging in equity stripping by making a loan based solely on the collateral value of Plaintiff's home, with no regard for her capacity to repay. Plaintiff seeks rescission, return of all amounts paid, actual damages, statutory damages, and attorneys' fees under 15 U.S.C. § 1640.

**Subcount C --- Real Estate Settlement Procedures Act (RESPA), 12U.S.C. §§ 2601 et seq.**

124. RESPA prohibits undisclosed kickbacks and fee-splitting between settlement service providers, requires accurate Good Faith Estimates and HUD-1 Settlement Statements, and prohibits the imposition of charges for services not performed. 12 U.S.C. §§ 2603, 2607.

125. Defendants violated RESPA by: (a) splitting a single loan transaction into two instruments through two entities without disclosure; (b) imposing double closing costs on Plaintiff; (c) charging for an appraisal that was never performed; (d) charging fees with no description beside them on the settlement statements; (e) providing inaccurate HUD-1 Settlement Statements; and (f) engaging in undisclosed arrangements between the lender entities, the closing attorney, the mortgage broker, and the title company. Plaintiff is entitled to treble damages on improper charges, actual damages, attorneys' fees, and costs. 12 U.S.C. § 2607(d)(2).

## COUNT II

## VIOLATIONS OF THE FAIR HOUSING ACT AND EQUAL CREDIT OPPORTUNITYACT

*Fair Housing Act, 42 U.S.C. §§ 3601 et seq. | ECOA, 15 U.S.C. § 1691*

*(Against Cognata, SC Home Holdings, and Landvest Holdings)*

### Subcount A --- Fair Housing Act (FHA)

126. The FHA prohibits discrimination in the provision of residential real estate loans on the basis of sex and familial status, among other characteristics. 42 U.S.C. § 3605. Plaintiff is a woman and a mother. The enterprise targeted her --- a woman with limited income and no legal sophistication, living on family land with substantial equity --- as an ideal candidate for predatory extraction. The enterprise's pattern of victimizing similarly situated homeowners across multiple counties constitutes a pattern and practice of discriminatory lending. Plaintiff seeks actual damages, punitive damages, injunctive relief, and attorneys' fees under 42 U.S.C. § 3613.

### Subcount B --- Equal Credit Opportunity Act (ECOA)

127. ECOA prohibits discrimination in credit transactions on the basis of sex and other characteristics, and requires adverse action notices. 15 U.S.C. § 1691. Defendants targeted Plaintiff based in part on her status as a woman with limited income and no legal representation, offering her credit on terms deliberately designed to be unaffordable and to facilitate property seizure. Plaintiff is entitled to actual and punitive damages under 15 U.S.C. § 1691e.

## PART TWO: STATE LAW VIOLATIONS

## COUNT III

## FRAUD, DEED FORGERY, AND FRAUDULENT CONCEALMENT

*(Against Cognata, Catoe, DC Terry, Dawn Hammond, Don Hammond, and Palmetto)*

### Subcount A --- Common Law Fraud

128. Defendants made material misrepresentations to Plaintiff, including: the true amount of the loans; the existence of a single lender; the legitimacy of the closing documents; the nature of the deed transfer; that an appraisal had been conducted when none had; that DC Terry was acting as Plaintiff's neutral broker when he was aligned with the lender; and that the transaction was routine when it was designed to defraud. Defendants knew these representations were false. Plaintiff reasonably relied on them to her devastating detriment.

### Subcount B --- Deed Forgery

129. Defendants caused the preparation, execution, notarization, and recording of a deed bearing the forged signature of Plaintiff's deceased brother --- a person who died in 2014 and could not have signed any document in 2017. Catoe notarized this instrument while simultaneously serving as Cognata's attorney and the loan closing attorney. This forgery was carried out with the participation of Dawn Hammond as witness. Don Hammond corresponded about the deed when Plaintiff questioned it. The forged deed (Exhibit E) is void ab initio and should be expunged from the public record. Its recording constitutes fraud upon the state recording system and a criminal act under S.C. Code § 16-13-10.

130. The transfer of title out of Plaintiff's name on the same day the first loan was signed --- before she had defaulted on anything, before any debt was due --- is conclusive evidence that the property seizure was premeditated. The loan was not a loan. It was a mechanism for acquisition.

### Subcount C — Fraudulent Concealment

**131.** Defendants actively concealed from Plaintiff: the existence of two loans; the unlicensed status of the lender; the forged nature of the deed; Banks's prior representation of Plaintiff; Kimmons's husband's conflict of interest; DC Terry's loyalty to Cognata; the equity to which Plaintiff was entitled; and the fraudulent alteration of public court records. Active concealment tolls all applicable statutes of limitations. Plaintiff did not and could not have discovered the full extent of this concealment until after the eviction in February 2023.

## COUNT IV

## FRAUDULENT CONVEYANCE AND EQUITY THEFT

*S.C. Code §§ 27-23-10 et seq.*

*(Against Cognata and Landvest Holdings)*

**132.** Cognata caused Plaintiff's Property to be acquired at his own judgment lien sale — on a fraudulently originated debt, through proceedings presided over by a disqualified judicial officer, at a price he effectively controlled. Plaintiff was entitled to the full equity value of her Property, which was owned free and clear and valued between $120,000 and $150,000. She received nothing. The subsequent artificial inflation of the debt balance — whereby the original $18,000 disbursement was grown to over $56,000 through fabricated fees and interest with no accounting, specifically to consume any equity that would otherwise have remained after the sale — constitutes fraudulent conveyance under South Carolina law and conversion of Plaintiff's property interest. Plaintiff seeks avoidance of the conveyance, return of the Property or its fair market value, all equity owed, and punitive damages.

## COUNT V

## WRONGFUL FORECLOSURE

*(Against Cognata, Landvest Holdings, Caskey, and Banks)*

**133.** The foreclosures against Plaintiff were wrongful on each of the following independent grounds: (a) Lack of Standing: Landvest was subject to the BOFI Cease and Desist and lacked authority to service or foreclose on the loan. A party without standing to enforce a note cannot foreclose. *In re Foreclosure Cases*, 521 F. Supp. 2d 650, 653 (S.D. Ohio 2007); (b) Unlicensed Lending: the underlying mortgage was void as issued by an unlicensed entity. A contract made in violation of a licensing statute is void and unenforceable. *Restatement (Second) of Contracts* § 181; (c) Conflicted Tribunal: all orders entered by Banks are void for lack of jurisdiction due to his disqualifying prior attorney-client relationship with Plaintiff. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); (d) Jurisdictional Excess: Banks, as Master-in-Equity, lacked subject matter jurisdiction to enter a judgment lien foreclosure --- an exercise of legal rather than equitable jurisdiction. *Lacks v. Lacks*, 41 N.Y.2d 71, 74 (1976) (acts in excess of subject matter jurisdiction are void); (e) Procedural Abuse: Cognata foreclosed on the second mortgage before the first, violating established lien priority under South Carolina law. S.C. Code § 29-3-610; (f) Mid-Case Conversion Without Notice: Cognata converted the original foreclosure case to a suit on the promissory note without providing Plaintiff formal notice of that conversion, then filed a simultaneous second case on a judgment lien, subjecting Plaintiff to duplicative simultaneous proceedings on the same underlying obligation without adequate notice or opportunity to respond --- a violation of due process and South Carolina Rules of Civil Procedure Rule 15; (g) Violation of BOFI Order: proceeding with foreclosure in knowing

violation of a state regulatory cease and desist order is independently unlawful and constitutes contempt of a regulatory order.

---

## COUNT VI

## ILLEGAL EVICTION AND INTENTIONAL DESTRUCTION OFPROPERTY

*(Against Cognata, Landvest Holdings, and Graham)*

134. The eviction was unlawful as executed pursuant to void orders entered without jurisdiction. Even if the eviction had been procedurally valid, the manner of its execution was not. Graham's false assurance that enforcement would be delayed deprived Plaintiff of the ability to protect her belongings. The storm that destroyed Plaintiff's possessions had been publicly forecast for more than a week before the eviction date --- Cognata and Graham both knew it was coming when they scheduled and executed the eviction on that day. Defendants deliberately placed Plaintiff's possessions at the far end of a long wooded driveway, out of sight from the house — the property fronts the main road but the driveway end could not be seen from inside the home, in a location that ensured the destruction would not be easily observed or stopped. Witnesses driving past the property observed movers pushing Plaintiff's belongings directly off trucks and alerted Plaintiff. When Plaintiff went to Graham and begged him to go down the driveway to witness the destruction in progress, he refused. Plaintiff discovered her jewelry had been thrown into the surrounding woods. Her dishes --- representing years of accumulated household goods --- were placed in thin Dollar General plastic bags and arrived completely broken. Photographs document this (Exhibit S). Her clothing and personal items were packed in industrial black trash bags. Her outdoor property --- including a large roll of fencing purchased for a planned fence installation, rakes, outdoor tools, trash cans, and all exterior equipment --- was left on the property. When

Plaintiff subsequently attempted to walk to the front door of the home on a later date to knock and request retrieval of her remaining belongings, Cognata's agents called law enforcement and had a no-trespassing order placed against her. Under South Carolina law Plaintiff was entitled to access to retrieve her personal property. That right was deliberately denied. On Monday morning following the Friday eviction, Cognata arrived at the Property with a backhoe and scraped away all remaining belongings that Plaintiff and her family had been unable to retrieve over the storm-ravaged weekend --- the mechanical, final elimination of every remaining trace of Plaintiff's life on that property. The fact that a backhoe was available and deployed on Monday morning reflects advance planning. Graham was present during the eviction, threatened to arrest Plaintiff multiple times, and called her "stupid" repeatedly in front of her mother and the moving crew. The Calhoun County Sheriff's Department subsequently failed to investigate any complaint filed by Plaintiff against Graham, failed to discipline him, and failed to take any remedial action --- rendering the Department independently liable under Monell. The removal of nearby surveillance cameras prior to or contemporaneous with the eviction further evidences premeditation. Plaintiff sustained loss of personal property conservatively valued at no less than $150,000 --- a figure that is itself an underestimate, as the full contents of a family home accumulated over fifteen years cannot be completely inventoried from memory --- and is entitled to compensatory and punitive damages.

## COUNT VII

## BREACH OF FIDUCIARY DUTY

*(Against Catoe, DC Terry, and Thuss)*

**135.** Catoe, as the closing attorney, DC Terry, as Plaintiff's mortgage broker, and Thuss, as Plaintiff's litigation attorney, each owed Plaintiff a fiduciary duty of loyalty, candor, and undivided representation. An attorney owes his client the highest duty of loyalty known to the law. *Singleton v. Stokes*, 184 S.C. 490, 498 (1937). A mortgage broker owes a fiduciary duty to the borrower, not the lender. *Wyatt v. Union Mortg. Co.*, 24 Cal.3d 773, 782 (1979). Each Defendant breached that duty: Catoe by serving simultaneously as Cognata's attorney, the closing attorney, and the notary on a forged instrument --- a classic conflict prohibited by Rule 1.7 of the South Carolina Rules of Professional Conduct; DC Terry by testifying at trial against his own client on behalf of the lender; and Thuss by accepting a $2,500 payment from the opposing party while still representing Plaintiff, transmitting a settlement offer drafted by opposing counsel, and urging Plaintiff to sign away all her claims --- conduct constituting per se breach of fiduciary duty and violation of Rule 1.8(f) of the South Carolina Rules of Professional Conduct. Each breach caused direct, severe harm to Plaintiff.

## COUNT VIII

## ABUSE OF PROCESS AND MALICIOUS USE OF PROCESS

*(Against All Defendants)*

**136.** Defendants used the South Carolina court system --- foreclosure proceedings, contempt proceedings, eviction enforcement --- not to vindicate legitimate rights, but as instruments of property extraction, intimidation, and retaliation. The foreclosure was brought by an unlicensed entity through a disqualified tribunal. A second simultaneous case was filed to circumvent Plaintiff's appeal victory. The contempt proceeding was brought to punish and impoverish

Plaintiff for exercising her legal rights. Each constitutes a separate and actionable abuse of process.

## COUNT IX

## CIVIL CONSPIRACY AND COLLUSION

*(Against All Defendants)*

**137.** Defendants combined for the purpose of injuring Plaintiff through: (a) issuing an unlicensed, fraudulently documented loan; (b) forging deed instruments to manufacture a superior property interest; (c) ensuring Plaintiff's legal challenges were suppressed through a conflicted judicial officer; (d) transmitting a corrupt settlement offer through her own attorney, paid from the opposing party's funds, to silence her; (e) using the eviction to destroy her remaining property; (f) coordinating with county officials to reduce the assessed value of the Property after acquisition; and (g) tampering with public court records to conceal the vacated nature of the first foreclosure. Plaintiff sustained severe special damages as a direct result.

## COUNT X

## FRAUD UPON THE COURT

*(Against Banks, Caskey, Catoe, Thuss, and Cognata)*

**138.** Defendants committed fraud upon the court by: (a) permitting a disqualified judicial officer with a prior attorney-client relationship to the opposing party to preside over both cases; (b) submitting a forged deed to the court in connection with the foreclosure; (c) Caskey testifying under oath that the SC Home Holdings loan did not exist, in direct contradiction to the documentary record; (d) manufacturing a false "consent" to enter a dispositive order after

Plaintiff had explicitly objected and Banks himself had acknowledged in writing that no consent existed; (e) Banks directing opposing counsel through personal email to draft his own orders, specifying their content, outside any formal court proceeding; (f) causing the public court record to reflect the vacated foreclosure as "satisfied" --- a fraudulent alteration of the official record; and (g) excluding Plaintiff from critical Department of Revenue filings. All judgments obtained through fraud upon the court are void.

## COUNT XI

## DECLARATORY RELIEF --- LACK OF STANDING AND VOIDJUDGMENTS

*28 U.S.C. §§ 2201--2202*

*(Against Cognata and Landvest Holdings)*

139. Plaintiff seeks a declaration that: (a) Landvest Holdings lacked standing to foreclose; (b) the underlying loan instruments are void for unlicensed lending; (c) the forged deed is void ab initio and must be expunged; (d) the public record entry of "satisfied" on the vacated case is false and must be corrected to reflect "vacated"; (e) both lis pendens must be removed from the public index; (f) all orders entered by Banks in both cases are void as entered without lawful jurisdiction; and (g) all false Department of Revenue liens are void and must be expunged from all records associated with Plaintiff.

## PART THREE: CIVIL RIGHTS AND CONSTITUTIONAL VIOLATIONS

## COUNT XII

## DEPRIVATION OF DUE PROCESS --- 42 U.S.C. § 1983

*Fourteenth Amendment --- Procedural and Substantive Due Process*

*(Against Banks, Kimmons individually; and Calhoun County)*

**Subcount A --- Banks: Denial of Impartial Tribunal**

**140.** The Due Process Clause guarantees the right to a hearing before a fair and impartial tribunal. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). Banks knew of his disqualifying conflict, was confronted with documentary proof, and refused to recuse. Every order he entered is constitutionally void. Banks also entered a judgment lien foreclosure order as Master-in-Equity despite lacking subject matter jurisdiction --- a separate due process violation. Banks's conduct of coordinating case outcomes through private email with opposing counsel, directing opposing counsel to draft his orders, and entering a false "consent" order constitute independent procedural due process violations that are not entitled to immunity protection.

**Subcount B --- Kimmons: Illegal Contempt and Denial of Right toPresent Evidence**

**141.** Due process requires that before a person is imprisoned for contempt, she must be given the opportunity to present witnesses and evidence in her own defense. *Pointer v. Texas*, 380 U.S. 400 (1965). Kimmons denied Plaintiff this right entirely. She failed to recuse despite a disclosed conflict of interest. Her contempt sentence was constitutionally unsupported. She failed to conduct a mandatory ability-to-pay hearing before imposing an incarceration sentence conditioned on payment of attorney fees. The conditions of Plaintiff's confinement --- a janitor's closet, floor, inadequate food, no natural light --- independently violate substantive due process.

**Subcount C --- Calhoun County: Municipal Liability(Monell)**

**142.** Calhoun County is liable under *Monell* for its deliberate indifference to constitutional violations by its judicial and law enforcement officers, its failure to maintain proper oversight of a Master-in-Equity operating without a valid oath of office and with disqualifying conflicts, and

its maintenance of a system that systematically denied due process to pro se, financially vulnerable litigants.

## COUNT XIII

## DENIAL OF EQUAL PROTECTION --- 42 U.S.C. § 1983

*Fourteenth Amendment --- Sex / Gender Discrimination*

*(Against All Defendants Acting Under Color of Law)*

143. Defendants, acting under color of law, treated Plaintiff differently from similarly situated property owners, denied her equal access to an impartial tribunal, and used state power to enforce a predatory scheme that specifically targeted her because she was a woman with limited income, no legal sophistication, and equity-rich land. The Equal Protection Clause prohibits state actors from treating individuals differently based on sex without an exceedingly persuasive justification. *United States v. Virginia*, 518 U.S. 515, 531 (1996). Predatory lending that disproportionately targets women constitutes sex discrimination actionable under both the Equal Protection Clause and the Fair Housing Act. *City of Memphis v. Greene*, 451 U.S. 100, 128 (1981). The enterprise's demonstrated pattern of victimizing similarly situated individuals supports an inference of discriminatory animus based on sex and economic vulnerability. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (discriminatory purpose may be inferred from totality of circumstances). Plaintiff is entitled to compensatory and punitive damages.

## COUNT XIV

## UNLAWFUL SEIZURE OF PROPERTY --- 42 U.S.C. § 1983

*Fourth and Fourteenth Amendments*

*(Against Graham and Calhoun County)*

**144.** The deliberate destruction of personal property by law enforcement officers acting under color of law constitutes an unreasonable seizure under the Fourth Amendment and a deprivation of property without due process under the Fourteenth. Graham's false assurance, his participation in the unannounced enforcement, his threatening conduct toward Plaintiff when she attempted to protect her belongings, and his deliberate inaction while Plaintiff's possessions were destroyed in a foreseeable storm constitute actionable constitutional violations. Calhoun County is liable under Monell for Graham's conduct.

## COUNT XV

### FIRST AMENDMENT RETALIATION --- 42 U.S.C. § 1983

*(Against Banks, Kimmons, Graham, and Cognata)*

**145.** Defendants subjected Plaintiff to a pattern of escalating adverse action in direct response to her exercise of the constitutional right to petition the courts for redress: the filing of a second case to circumvent her appeal victory; the execution of an immediate and destructive eviction despite a pending appeal; the retaliatory contempt prosecution and imprisonment; and the attempt to purchase her silence through a corrupt settlement offer transmitted through her own attorney. This pattern was designed to chill Plaintiff's constitutional right of access to the courts and constitutes First Amendment retaliation under 42 U.S.C. § 1983.

## COUNT XVI

### CONSPIRACY TO DEPRIVE CIVIL RIGHTS --- 42 U.S.C. §§ 1985(2) AND(3)

*(Against All Defendants)*

**146.** Defendants conspired to deprive Plaintiff of equal protection and equal privileges under the law, to obstruct her access to justice, and to suppress her legal rights through a disqualified tribunal, a corrupt settlement offer, and retaliatory prosecution. Any Defendant who had knowledge of this conspiracy and the power to prevent it but failed to do so is additionally liable under 42 U.S.C. § 1986.

---

## COUNT XVII

### ILLEGAL ARREST, UNLAWFUL IMPRISONMENT, AND CHILDENDANGERMENT

*42 U.S.C. § 1983 | Fourth and Fourteenth Amendments | Common Law*

*(Against Kimmons individually and Calhoun County)*

### Subcount A --- Illegal Arrest and UnlawfulImprisonment

**147.** Plaintiff was imprisoned for contempt arising from a good-faith, reasonable protective decision for her minor child's safety. At the time of the contempt hearing, Plaintiff was represented by a paid attorney for whom she had paid $2,500 — an attorney who failed to raise the mandatory ability-to-pay hearing requirement or protect her right to call witnesses. She was denied the right to call witnesses in her own defense. No ability-to-pay hearing was conducted before imposing incarceration conditioned on payment of attorney fees. A contempt sentence of incarceration imposed without procedural due process is an illegal arrest and unlawful imprisonment under the Fourth and Fourteenth Amendments and South Carolina law. *Turner v. Rogers*, 564 U.S. 431, 448 (2011) (due process requires adequate substitute procedural safeguards before incarcerating an unrepresented party for civil contempt including failure to pay). The Supreme Court specifically held in *Turner* that a court must conduct an inquiry into

ability to pay before jailing a person for civil contempt. *Id.* at 447--48. Kimmons conducted no such inquiry. The $2,300 attorney fee condition imposed without an ability-to-pay hearing renders the entire contempt order constitutionally void under *Turner*. Furthermore, incarcerating a parent for good-faith protective action toward a child --- without permitting that parent to present any witnesses or evidence --- violates the most basic requirements of due process. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (due process requires consideration of the private interest affected, the risk of erroneous deprivation, and the government's interest).

## Subcount B --- Endangerment of Minor Child

**148.** The illegal incarceration of Plaintiff --- her child's sole primary caregiver and homeschool teacher --- without any advance notice or opportunity to arrange care, foreseeably placed Koy without parental protection and care. Plaintiff was taken directly from the courtroom without being permitted to contact any family member. Family members received no warning and were forced to take emergency time off work. This constitutes a violation of both Plaintiff's and Koy's substantive due process right to family integrity under the Fourteenth Amendment.

**148-A.** The broader impact of the enterprise on Koy cannot be overstated. Koy was eight years old when the eviction occurred. His birthday is in December. Every gift he received for his birthday and for Christmas was destroyed in the storm that followed the eviction. He was rendered homeless along with his mother and dragged from house to house for six to eight months. His homeschool education --- which Plaintiff had provided since COVID interrupted traditional schooling --- was thrown into chaos. He lost his home, his possessions, his routine, his stability, and his sense of safety through the deliberate actions of the enterprise. The custody proceedings that followed, presided over by a conflicted judicial officer, forced Koy into a legal relationship with a biological father who had no involvement in his life, while simultaneously

jailing the mother who had raised him and sidelining the father figure who had been present throughout his childhood. No child should experience what Koy experienced. Every harm to Koy is a direct and foreseeable result of the enterprise's conduct, and Plaintiff seeks full damages for the impact of this scheme on her son's life, stability, education, and wellbeing.

---

## PART THREE-B: ADDITIONAL STATE LAW CLAIMS

---

## COUNT XVIII

## MALICIOUS PROSECUTION AND ABUSIVE CONTEMPT

*South Carolina Common Law | 42 U.S.C. § 1983*

*(Against Cognata, Caskey, Banks, Kimmons, and Calhoun County)*

**148-B.** To establish malicious prosecution under South Carolina law and the Fourth Amendment, a plaintiff must show: (1) institution of legal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in Plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause; and (6) resulting injury. *Parrish v. Allison*, 376 S.C. 308, 320 (Ct. App. 2008).

**148-C.** Each element is satisfied here. Cognata and Caskey instituted Case No. 2021-CP-09-00174 --- a second simultaneous foreclosure case filed immediately after Plaintiff won her appeal vacating the first foreclosure. The first case was terminated in Plaintiff's favor when the foreclosure was vacated (Exhibit H). The second case was filed not to vindicate a legitimate legal right but to circumvent Plaintiff's appeal victory and accomplish through parallel proceedings what had been undone through the courts --- classic malicious prosecution. There was no probable cause to file a judgment lien foreclosure on a debt that had already been

declared invalid through the first vacating order; the debt was the same debt, repackaged in a new theory. The malice is documented: the second case was filed through a disqualified tribunal, without disclosure of the first case's vacated status, during active appellate proceedings, in violation of the BOFI Cease and Desist Order, and at a time when Cognata simultaneously violated the Governor's pandemic eviction moratorium. The injury is total: Plaintiff lost her property, her home, every possession, and her freedom as a result.

**148-D.** Defendant Kimmons engaged in abusive contempt. The South Carolina contempt power is not unlimited. Contempt is impermissible where it is used not to compel compliance with a court order but to punish a party for the exercise of a constitutional right. *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 828 (1994). Kimmons imposed incarceration not because Plaintiff had violated a valid order but because a biological father with no prior role in Koy's life invoked the court's contempt power over a single missed visitation rooted in Plaintiff's legitimate protective instincts. Kimmons conducted no ability-to-pay hearing, barred all witnesses, and imposed thirty days of incarceration conditioned on payment of opposing counsel's fees --- a textbook example of the unconstitutional contempt power that *Turner v. Rogers* was decided to prevent. Used in this way, contempt becomes a tool of harassment and punishment, not a legitimate exercise of judicial authority.

## PART FOUR: FEDERAL RICO --- THE ENTERPRISE IN FULL

*All violations set forth in Parts One through Three are incorporated herein as predicate racketeering acts.*

## COUNT XIX

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

*18 U.S.C. § 1962(c) --- Conducting Enterprise Affairs Through a Pattern of Racketeering*

*(Against All Defendants)*

149. Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted and participated in the affairs of an "enterprise" within the meaning of 18 U.S.C. § 1961(4), through a pattern of racketeering activity consisting of the following predicate acts:

### Predicate Act 1 --- Wire Fraud (18 U.S.C. § 1343): Fraudulent LoanDisbursement, July 2017.

On or about July 2017, Defendants Cognata, Catoe, SC Home Holdings, and Palmetto transmitted by interstate wire a loan disbursement of funds to Plaintiff while simultaneously executing a promissory note stating $25,000 and a mortgage stating $35,000 (Exhibits A, B, C) --- figures irreconcilable with each other and with the wire amount. The wire transmission of funds in an amount contradicted by the simultaneously executed documents constitutes wire fraud.

### Predicate Act 2 --- Wire Fraud (18 U.S.C. § 1343): SecondFraudulent Loan, August 2017.

On or about August 2017, Defendants Cognata, Catoe, DC Terry, Landvest Holdings, and Palmetto transmitted by interstate wire funds for a second undisclosed loan through a second undisclosed entity --- Landvest Holdings I, LLC --- which Plaintiff had never agreed to do business with, containing additional irreconcilable figures on the HUD-1 settlement statement. Each wire transmission in furtherance of this undisclosed second transaction is a separate predicate act.

### Predicate Act 3 --- Mail Fraud (18 U.S.C. § 1341): Forged DeedTransmitted Through the Recording System, July 2017.

On or about July 2017, Defendants Cognata, Catoe, and Dawn Hammond caused a deed bearing the forged signature of Plaintiff's deceased brother to be executed, notarized, and transmitted through the South Carolina deed recording system --- a process utilizing the United States mails and interstate commerce --- transferring Plaintiff's property without her knowledge or consent on the same day as the loan closing.

**Predicate Act 4 --- Mail Fraud (18 U.S.C. § 1341): FraudulentBilling Statements, December 2017 Through 2022.**

Beginning in December 2017 and continuing through the foreclosure proceedings, Defendants transmitted through the United States mails billing statements through The Rental Gal demanding payment on two separate loan obligations that Plaintiff had never knowingly agreed to, which did not match the amounts in the loan documents, and to which no payments by Plaintiff were ever credited. Each billing statement is a separate predicate act.

**Predicate Act 5 --- Bank Fraud (18 U.S.C. § 1344): Submission ofFraudulent Instruments in Mortgage Transactions, 2017.**

Defendants submitted to federally regulated mortgage transaction processes instruments containing fabricated figures --- including HUD-1 settlement statements charging for an appraisal that was never performed, double closing costs, and line items with no description --- in connection with transactions involving federally regulated lending activities. Additionally, the closing documents contain two notable errors that reveal pre-fabricated, careless document preparation: (1) at least one mortgage document was prepared with "20___" as a pre-printed year blank, into which Defendant Catoe wrote "16" at the closing table before crossing it out --- meaning the closing attorney himself filled in the wrong year on a mortgage instrument; and (2) at least one of the mortgage documents identifies the county as **Lexington County** rather than

**Calhoun County** --- the county where Plaintiff's property is actually located --- and this error was never corrected. A mortgage instrument that identifies the wrong county is legally defective: it was recorded in the wrong jurisdiction, creates a cloud on title, and constitutes a defective instrument submitted to the recording system. These errors are not coincidental. They demonstrate that these documents were generic, pre-fabricated forms not specifically prepared for Plaintiff's transaction --- consistent with a lender issuing the same boilerplate instruments to multiple victims across multiple counties. Each submission of a materially deficient instrument is a separate predicate act.

**Predicate Act 6 --- Obstruction of Justice and Witness Tampering(18 U.S.C. §§ 1503, 1512): The Corrupt Settlement Offer,2020.**

On or about 2020, Defendants Cognata and Caskey arranged for a five-page settlement agreement to be transmitted to Plaintiff through her own attorney Rob Thuss, who simultaneously received a $2,500 payment from the opposing party. The document proposed that Plaintiff abandon all legal claims in exchange for zero consideration and permanent silence. Thuss presented and urged this offer while representing Plaintiff. This constitutes obstruction of justice and corrupt witness tampering.

**Predicate Act 7 --- Extortion Under Color of Official Right (18U.S.C. § 1951): Banks's Void Orders, 2018--2023.**

Defendants Banks and Cognata, through coordinated use of Banks's judicial position, used official authority to extract Plaintiff's property rights without legitimate legal basis, through proceedings over which Banks lacked jurisdiction. Banks directed opposing counsel by personal email to draft his own orders, coordinated outcomes outside formal proceedings, and entered a

false consent order after acknowledging in writing that no consent existed. Each void order entered in furtherance of property extraction constitutes a Hobbs Act predicate act.

**Predicate Act 8 --- Wire Fraud (18 U.S.C. § 1343): ManufacturedInsurance Cancellation, 2018.**

On or about 2018, Defendants caused or coordinated the cancellation of Plaintiff's homeowners insurance through Bray's Insurance --- an insurer Cognata personally recommended --- based on a fabricated claim of a visible roof defect on a property with no neighboring homes close enough to observe it, forcing Plaintiff to immediately obtain emergency replacement homeowners insurance through Nationwide under threat of immediate foreclosure. Cognata's foreclosure threat was transmitted by text message. The coordinated cancellation and the threat were transmitted through interstate wires and constitute wire fraud and extortion.

**Predicate Act 9 --- Mail Fraud (18 U.S.C. § 1341): Fraudulent CourtFilings in Second Case, 2021--2022.**

Beginning in 2021, Defendants Cognata and Caskey filed a second simultaneous foreclosure case, Case No. 2021-CP-09-00174, through the South Carolina court system --- a filing transmitted through the mails and court electronic systems --- without disclosing the full procedural history of the first case, without providing Plaintiff adequate notice of the conversion from foreclosure to judgment lien theory, and in violation of the BOFI Cease and Desist Order (Exhibit G). Each fraudulent court filing is a separate predicate act.

**Predicate Act 10 --- Wire Fraud (18 U.S.C. § 1343): PandemicMoratorium Violation, 2020.**

In 2020, three days after the Governor of South Carolina issued a moratorium on residential evictions, Cognata transmitted by electronic wire and social media the same eviction demand memo to his tenants and to Plaintiff during active litigation against her --- a communication that

went viral on Twitter. The deliberate electronic transmission of an illegal eviction demand in violation of a governor's emergency order, directed at an active litigation opponent, constitutes wire fraud and harassment.

**Predicate Act 11 --- Fraud Upon the Court / Perjury (18 U.S.C. §1621): False Testimony Under Oath, 2021–2022.**

During the state court proceedings, Defendants Caskey, Cognata, and Catoe each made statements under oath that are demonstrably contradicted by documentary evidence: Caskey and Cognata each testified that the SC Home Holdings loan did not exist; Cognata testified that Plaintiff had requested a $100,000 loan and became angry when denied; and Catoe testified on behalf of Cognata despite having served as Plaintiff's closing attorney. Each false statement under oath is a separate predicate act.

**Predicate Act 12 --- Conversion and Destruction of Property (18U.S.C. § 1951 / State Law): Backhoe Destruction, February2023.**

On the Monday morning following the Friday eviction, Cognata arrived at the Property with a backhoe and mechanically scraped and removed all remaining personal property belonging to Plaintiff that had survived the storm weekend. The advance deployment of heavy equipment to the property days after the eviction reflects premeditation and constitutes conversion and intentional destruction of personal property, independently actionable as a RICO predicate and a separate criminal act under South Carolina law.

**Predicate Act 13 --- Honest Services Fraud (18 U.S.C. §§ 1341,1343, 1346): Deprivation of Plaintiff's Right to Honest Services ofJudicial and Legal Officers, 2018–2023.**

Section 1346 of Title 18 provides that the term "scheme or artifice to defraud" includes a scheme to deprive another of the intangible right of honest services. *Skilling v. United States*, 561 U.S.

358, 400--04 (2010). Plaintiff had the right to the honest services of: (a) Martin R. Banks, as Master-in-Equity, who was constitutionally and ethically required to recuse himself and instead directed opposing counsel by personal Gmail to draft his orders and entered void judgments against the party he had previously represented; (b) Rob Thuss, as Plaintiff's own attorney, who accepted a financial kickback of $2,500 from the opposing party while urging Plaintiff to surrender all her rights; (c) Dennis Catoe, as closing attorney and notary, who simultaneously served as Cognata's personal attorney and notarized a forged deed while certifying its authenticity as an officer of the court; and (d) DC Terry, as mortgage broker under a written exclusive agency contract, who concealed his alignment with the opposing party and later testified against Plaintiff at trial. Each of these actors used the mails or wires in furtherance of their honest services fraud. Each deprivation is a separate predicate act under 18 U.S.C. §§ 1341, 1343, and 1346.

150. These thirteen documented predicate acts are related in purpose (property extraction and suppression of Plaintiff's legal rights), participants (the Enterprise members identified above), methods (fraud, forgery, judicial manipulation, manufactured financial crises, destruction of evidence and property), and victims (Plaintiff and numerous others across Calhoun, Lexington, Richland, and Orangeburg counties). They are continuous, spanning 2017 to the present. They constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5). *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989). Both closed-ended continuity (the completed scheme against Plaintiff) and open-ended continuity (the ongoing enterprise operating through numerous simultaneous court cases across multiple counties) are established.

**151.** As a direct and proximate result of this pattern of racketeering activity, Plaintiff has been injured in business and property within the meaning of 18 U.S.C. § 1964(c). She is entitled to treble damages and attorneys' fees.

## COUNT XX

## RICO CONSPIRACY

*18 U.S.C. § 1962(d)*

*(Against All Defendants)*

**152.** Each Defendant knowingly agreed and conspired with the others to violate 18 U.S.C. § 1962(c). Each was aware of the enterprise's scope, agreed to the commission of predicate acts, and agreed to the overall objective. Plaintiff is entitled to treble damages, attorneys' fees, and costs.

## VII. MOTION FOR EMERGENCY AND EXPEDITED RELIEF

**153.** Plaintiff and her minor son Koy are currently living in poverty as a direct and proximate result of the eight-year scheme described herein. They lost their home, their possessions, and their financial stability to a documented criminal enterprise. Plaintiff respectfully requests that this Court:

**(a)** Order emergency interim financial assistance to Plaintiff and her minor child pending the resolution of this action, given the ongoing irreparable harm of poverty and the documented destruction of all assets;

**(b)** Issue a Temporary Restraining Order immediately prohibiting Defendant Cognata, and all entities he owns or controls, from acquiring additional real property in South Carolina, from

initiating new foreclosure or eviction proceedings, and from contacting Plaintiff or her family, pending a hearing on a Preliminary Injunction; and

(c) Grant this case expedited scheduling status given the eight-year duration of the harm, Plaintiff's pro se status, the poverty of Plaintiff and her minor child, and the ongoing RICO enterprise. The following legal standards support granting emergency and expedited relief in this matter. First, a temporary restraining order is warranted where a plaintiff demonstrates (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008). All four factors are satisfied here. Second, under Reves v. Ernst & Young, 507 U.S. 170 (1993), a civil RICO plaintiff who demonstrates an ongoing enterprise causing continuing injury is entitled to equitable relief including injunctive remedies under 18 U.S.C. § 1964(a). The enterprise described herein continues to operate through numerous simultaneous court cases across multiple South Carolina counties. Third, the constitutional dimension of this case --- involving deprivation of a mother and child's home, possessions, and liberty through void judicial proceedings --- implicates the substantive due process standard of conduct that shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Fourth, the irreparable harm to Plaintiff's minor child Koy --- who is currently without stable housing, without a vehicle, without income, and without the educational stability that Plaintiff provided --- cannot be remedied by money alone after further delay. The right to family integrity and the parent-child relationship is a fundamental liberty interest protected by the Fourteenth Amendment. Troxel v. Granville, 530 U.S. 57, 65 (2000). Fifth, access to justice for an indigent pro se litigant is itself a constitutional interest. Boddie v. Connecticut, 401 U.S. 371, 374 (1971) (the state may not deny

a person access to its courts solely on account of inability to pay). Plaintiff has exhausted every non-judicial remedy available to her. This Court is the last available forum. Emergency relief is not merely warranted --- it is constitutionally compelled.

154. A mother and her child should not be in poverty, homeless, and without recourse because of a judgment lien on property worth far more than the debt --- particularly when that lien resulted from an unlicensed, fraudulently structured loan, was enforced by a conflicted judicial officer, and stripped the family of land they owned free and clear. Plaintiff requests that this Court take judicial notice of the systemic injustice embodied in South Carolina's judgment lien laws as applied to these facts.

## KOY BLAZE HUTTO — INDEPENDENT MINOR VICTIM DAMAGES

Koy Blaze Hutto, date of birth December 23, 2013, is the minor son of Plaintiff Pamela Elizabeth Brown and has suffered independent constitutional injuries as a direct and proximate result of the enterprise described herein. Minor children possess independent constitutional rights to family integrity and parental care under the substantive due process clause of the Fourteenth Amendment. Troxel v. Granville, 530 U.S. 57 (2000); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977).

Koy's independent injuries include: (a) rendering him homeless for approximately six to eight months as a direct result of the wrongful eviction executed pursuant to void court orders; (b) depriving him of his sole primary caregiver and homeschool teacher when Defendant Kimmons

jailed Plaintiff without advance notice, without ability-to-pay hearing, and without any opportunity to arrange alternative care --- leaving a minor child without parental protection or care; (c) subjecting him to ongoing poverty, instability, educational disruption, and emotional trauma caused by the financial destruction wrought by the enterprise over seven years of his life from age three through the present; and (d) exposing him directly to the physical destruction of his home and possessions during the wrongful eviction.

Plaintiff seeks compensatory damages on behalf of Koy Blaze Hutto for each of the foregoing injuries, in amounts to be determined at trial, in addition to all other relief sought herein. These damages are independent of and in addition to Plaintiff's own damages and are not subject to reduction based on any finding applicable solely to Plaintiff's claims.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pamela Elizabeth Brown respectfully demands judgment in her favor against all Defendants, jointly and severally, and prays this Court grant the following relief:

**A.** EMERGENCY INTERIM RELIEF: Financial assistance to Plaintiff and her minor son Koy pending resolution, and a Temporary Restraining Order halting all of Cognata's real estate acquisition and foreclosure activity in South Carolina;

**B.** COMPENSATORY DAMAGES for the wrongful loss of Plaintiff's real property --- nearly four acres of family land including a 2,000 sq. ft. home, valued between $120,000 and $150,000 --- including its fair market value and all appreciation since the wrongful taking;

**C.** COMPENSATORY DAMAGES for the theft of surplus equity in the full amount to be established through accounting and appraisal, reflecting that the Property was owned free and clear with no prior encumbrance;

**D.** COMPENSATORY DAMAGES for the intentional destruction of all personal property during and after the eviction, including: furniture, electronics, clothing, jewelry, dishes, holiday gifts, personal documents, outdoor equipment, tools, fencing, and all other personal belongings, conservatively valued at no less than $150,000 and believed to be substantially higher; all costs to replace essential household items including furniture, dishes, clothing, and personal necessities required to establish a new household; all utility connection costs incurred upon obtaining new housing including electricity, water, and internet service; all rental payments made by Plaintiff for housing she was forced to obtain as a direct result of the wrongful eviction; and ADDITIONAL DAMAGES for the permanent, irreplaceable loss of: twenty (20) handmade queen-size quilts passed down through generations of Plaintiff's family, which cannot be replaced at any price; hospital memorabilia from Plaintiff's children including birth certificates and hospital bracelets; and the last tangible personal mementos belonging to Plaintiff's deceased brother, whose forged signature was used to steal her property, and whose memory was further desecrated by the destruction of the only physical items remaining to his family. Plaintiff seeks the maximum available damages for these irreplaceable losses;

**E.** COMPENSATORY DAMAGES for the illegal arrest and unlawful imprisonment of Plaintiff, including loss of liberty, physical harm, emotional trauma, impact on her minor child, and the total of $4,800 in attorney fees paid in direct connection with the unconstitutional contempt proceeding ($2,500 to Plaintiff's own retained attorney who failed to protect her rights, and $2,300 paid by Plaintiff's daughter to opposing counsel as the price of Plaintiff's freedom);

F. COMPENSATORY DAMAGES for emotional distress, loss of housing (six to eight months of homelessness), destruction of family unity, and the lasting impact on Plaintiff and her son Koy;

G. TREBLE DAMAGES on all RICO claims pursuant to 18 U.S.C. § 1964(c);

H. PUNITIVE DAMAGES against each individual Defendant whose conduct was willful, malicious, fraudulent, or in deliberate disregard of Plaintiff's rights;

I. RESCISSION of all loan transactions and discharge of any purported obligation owed to Defendants or their successors or assigns;

J. A DECLARATION that: all judgments entered by Banks are void; Landvest lacked standing to foreclose; the forged deed is void and must be expunged; the public record entry of "satisfied" on Case No. 2018-CP-09-00118 is false and must be corrected to "vacated"; both lis pendens must be removed from the public index; and all false Department of Revenue liens are void and must be expunged;

K. An ORDER for a complete accounting of all loan funds, payments, foreclosure proceeds, equity, rental income received by Defendants from the Property from the first day any tenant was placed through the present date, and all other financial benefits received as a result of the fraudulent acquisition of Plaintiff's Property --- and an ORDER that all rental income collected from Plaintiff's former Property be disgorged and paid to Plaintiff as restitution for the ongoing unjust enrichment resulting from his fraudulent acquisition;

L. INJUNCTIVE RELIEF permanently prohibiting Cognata and all entities he owns or controls from engaging in mortgage lending, foreclosure, or property acquisition in South Carolina;

M. STATUTORY DAMAGES under TILA, HOEPA, RESPA, the FHA, and ECOA;

N. An ORDER directing all damages, proceeds, and funds awarded herein to be paid into a single designated trust account established by Plaintiff (the "Pamela Elizabeth Brown Recovery

Trust," to be established), to consolidate all recovery in a single proceeding and avoid requiring Plaintiff to initiate multiple subsequent actions to collect;

**O.** An ORDER referring all evidence of criminal conduct described herein --- including deed forgery, unlicensed lending, obstruction of justice, witness tampering, Hobbs Act extortion, and pandemic moratorium violations --- to the United States Attorney's Office for the District of South Carolina, the FBI Public Corruption Unit, and the Civil Rights Division of the Department of Justice for criminal investigation;

**P.** An ORDER directing investigation into: Defendant Banks's fitness to serve as Master-in-Equity including the absence of a valid oath of office, his property holdings within the county he presides over, his simultaneous private law practice, and his failure to recuse; and into the South Carolina judgment lien laws as applied to residential family property, including whether reform is warranted to prevent the homelessness of parents and children over liens far below the value of the encumbered property;

**Q.** ATTORNEYS' FEES and costs under 18 U.S.C. § 1964(c), 42 U.S.C. § 1988, 15 U.S.C. § 1640, 12 U.S.C. § 2607, and 42 U.S.C. § 3613;

**R.** PRE-JUDGMENT AND POST-JUDGMENT INTEREST at the maximum rate permitted by law; and

**S.** Such OTHER AND FURTHER RELIEF as this Court deems just, equitable, and proper.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

## X. NOTICE OF PUBLIC INTEREST DISCLOSURE

Plaintiff hereby provides notice that, thirty (30) days following the filing of this Complaint, she intends to exercise her First Amendment right to free speech and press by making the facts and evidence described herein available to independent journalists and news media organizations for the purpose of public reporting.

This disclosure is not made as a threat or as leverage. It is made because the conduct described in this Complaint has harmed families across Calhoun, Lexington, Richland, and Orangeburg counties; because every state agency that should have protected those families failed to do so; because the public has a right to know about the operation of a documented RICO enterprise that used the county court system as its enforcement arm; and because transparency and press freedom are the last remaining checks on institutional misconduct when all official channels have failed.

Plaintiff also calls upon any other individuals who have been victimized by Benjamin Cognata, his associated entities, or the judicial officers and attorneys described in this Complaint, to document their experiences and come forward through appropriate legal channels. You are not alone.

Respectfully submitted,

*Pamela E Brown*

4-24-26

PAMELA ELIZABETH BROWN

Plaintiff, Pro Se

106 Butler Drive

Livingston, South Carolina 29107

(803) 596-7218

bbrown0623@yahoo.com

Dated: _____

---

## VERIFICATION

I, Pamela Elizabeth Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and that the factual allegations contained therein are true and correct to the best of my personal knowledge, information, and belief.

_____

PAMELA ELIZABETH BROWN

Dated: _____

---

## PLAINTIFF'S EXHIBIT LIST

**Exhibit A** — Bank wire transfer record showing $18,000 actual disbursement vs. $25,000 Promissory Note and $35,000 Mortgage

**Exhibit B** — Promissory Note, Landvest Holdings I LLC (all pages)

**Exhibit C** — Mortgage Documents, SC Home Holdings LLC and Landvest Holdings I LLC (both instruments, all pages)

**Exhibit D** — HUD-1 Settlement Statements for both loan transactions (double closing costs, undescribed fees, fabricated appraisal charge, irreconcilable figures)

**Exhibit E** — Forged Deed bearing purported signature of Plaintiff's deceased brother (died 2014), witnessed by Dawn and Donald Drummond, notarized by Catoe

**Exhibit F** — Original Deed to Property bearing Martin R. Banks's witness signature on 2009 title chain documents

**Exhibit G** — BOFI Cease and Desist Orders issued against Cognata, SC Home Holdings, and Landvest Holdings I LLC for unlicensed mortgage lending and servicing

**Exhibit H** — Order Granting Motion for Relief from Judgment (vacating first foreclosure), February 3, 2020, Case No. 2018-CP-09-00118

**Exhibit I** — Final Order and Judgment, May 21, 2021, Case No. 2018-CP-09-00118 ($49,874.76 total judgment entered by Banks)

**Exhibit J** — Order and Judgment of Foreclosure and Sale, May 18, 2022, Case No. 2021-CP-09-00174 ($56,745.41 judgment; Cognata credit-bid exact amount at his own sale)

**Exhibit K** — Writ of Assistance, November 29, 2022, Case No. 2021-CP-09-00174 (signed by Banks)

**Exhibit L** — Order Denying Motions for Stay, February 10, 2023 (Banks characterizing Plaintiff's constitutional arguments as "frivolous")

**Exhibit M** — Public index screenshot showing vacated foreclosure listed as "satisfied" — fraudulent alteration of official court record

**Exhibit N** — Both lis pendens listed as "pending" on public index — ongoing cloud on title as of filing date

**Exhibit O** — Written settlement offer transmitted by Thuss: five-page document drafted by Caskey, including $2,500 payment from opposing party to Thuss, zero consideration to Plaintiff, permanent confidentiality clause, and lifetime prohibition on future claims

**Exhibit P** — Email chain: Banks's personal Gmail directing Caskey to draft orders; manufactured consent; February 5, 2023 eviction date set by private email outside any formal proceeding; Banks & Neumeister dual-role signature on judicial correspondence

**Exhibit Q** — Text message communications with Cognata, including foreclosure threat if insurance not maintained and "my favorite lady" post-eviction response

**Exhibit R** — Property tax assessment records for 110 Kennerly Road: $117,400 assessed value (2020); off-cycle assessment issued March 6, 2023 (one week after eviction) reducing value outside normal October-November assessment cycle; full year-by-year history through 2024

**Exhibit S** — Photographs of destroyed personal property following eviction: dishes in Dollar General bags, belongings scattered in woods, boarded windows, and general property condition before and after storm (S-1 through S-16)

**Exhibit T** — Itemized inventory of destroyed and stolen personal property with estimated replacement values — $134,100+

**Exhibit U** — Loan payment records and billing statements showing no payment by Plaintiff ever credited against any balance

**Exhibit V** — Mr. Mortgage Residential Mortgage Broker Contract signed by DC Terry: REPRESENTATION clause states "I do not have an agency relationship with any other person," certifying exclusive fiduciary duty to Plaintiff

**Exhibit W** — Bray's Insurance cancellation documentation; Nationwide emergency replacement insurance records; evidence of Cognata's recommended insurer and manufactured cancellation

**Exhibit X** — Courtney Baltzegar forwarded email dated July 17, 2020: Cognata's ManageBuilding property management system designating 110 Kennerly Road as rental while Plaintiff was still living there and litigation was active

**Exhibit Y** — Cognata's pandemic eviction notice transmitted three days after Governor's moratorium; viral Twitter documentation

**Exhibit Z** — State newspaper article quoting Cognata on acquiring land cheaply at tax sales

**Exhibit AA** — False South Carolina Department of Revenue liens filed against Plaintiff in Case No. 2021-CP-09-00174 and Plaintiff's challenge correspondence

**Exhibit BB** — South Carolina Department of Consumer Affairs correspondence (Kenneth Middlebrook, Brian Gibbs); in-person meeting documentation; complaint returned unopened; investigation opened and dropped without enforcement action

**Exhibit CC** — Records from custody and contempt proceedings before Judge Kimmons

**Exhibit DD** — Documentation of complaint filings to DOJ, FBI, SC Attorney General, SC Judicial Commission, SC Commission on Judicial Ethics, SC Bar Association, CFPB, HUD, and all other agencies

**Exhibit EE** — Banks & Neumeister / Martin Banks Atty. at Law LLP South Carolina Secretary of State registration records confirming simultaneous operation of private law practice

**Exhibit FF** — Complete record of both state court cases: all pleadings, orders, hearing transcripts, and filings, Case Nos. 2018-CP-09-00118 and 2021-CP-09-00174

**Exhibit GG** — Photographs of property after Cognata's acquisition: boarded windows, new roof installation, evidence of rental occupancy and improvements

**Exhibit HH** — All additional supporting documents, correspondence, and evidence not otherwise specifically enumerated above

**Exhibit II** — SCDOT Carolina Crossroads I-26 expansion documentation; Sandy Run Industrial Park records (760 acres, Amazon, Starbucks, Nephron Pharmaceuticals, Zeus Industrial, Blanchard Machinery $65M facility); Wilderland Development LLC Kennerly Road rezoning approval July 2024; regional development corridor documentation; current market value comparables ($259,867 to $315,200; comparable sale March 13, 2026 at $262,000)

**Exhibit JJ** — Calhoun County public index screenshots documenting fraudulent timeline: Case No. 2018-CP-09-00118 marked "satisfied" March 21, 2019 — nearly one year before Banks's February 3, 2020 vacating order. Both lis pendens still pending as of filing date.

**Exhibit KK** — Lexington County Case No. 2011-CP-32-02050, Branch Banking and Trust v. Gary C. Landry et al. — confirming Rob Thuss's prior relationship with Cognata, undisclosed to Plaintiff

**Exhibit LL** — January 19, 2018 letter from Defendant Dennis Wayne Catoe confirming in writing both loan transactions: SC Home Holdings LLC closing July 6, 2017 for $6,846, and Landvest Holdings I LLC closing August 17, 2017 for $25,000 — directly contradicting sworn testimony by Caskey and Cognata that the SC Home Holdings loan did not exist.

**Exhibit MM** — SC Home Holdings LLC 30-Day Notice to Vacate left on Plaintiff's door July 26, 2018 — directly contradicting testimony that the SC Home Holdings loan and entity did not exist.

**Exhibit NN** — Haynsworth Sinkler Boyd August 8, 2018 letter acknowledging Plaintiff's dispute of the Landvest Holdings debt — confirming Caskey's firm was fully engaged with this matter years before trial.

**Exhibit OO** — Martin R. Banks Facebook post advertising property for sale and directing another person to the Calhoun County tax sale list — while serving as Master-in-Equity over those same tax sales.

**Exhibit PP** — Calhoun County property tax and deed records showing Martin R. Banks's multiple real estate holdings, including a 72.5-acre parcel acquired July 8, 2021 for zero dollars — two months after entering $49,874.76 judgment against Plaintiff.

**Exhibit QQ** — Affidavit for Taxable or Exempt Transfers, Calhoun County TMS No. 037-00-00-062, executed by Mary M. Caskey simultaneously as Special Referee and as Attorney for Landvest Holdings I LLC, notarized by Carol Williamson, filed in Richland County, South Carolina, July 25, 2022.

**Exhibit RR** — July 6, 2017 deed purportedly executed by John B. Hutto (died 2014) bearing an impossible signature, witnessed and notarized by Defendant Catoe, with Catoe's sworn Affidavit for Exempt Transfers certifying the transaction under penalty of criminal prosecution.

**Exhibit SS** — October and December 2009 original title chain deeds bearing the witness signature of Martin R. Banks — confirming his direct personal knowledge of Plaintiff's Property ownership history nearly a decade before presiding over its fraudulent foreclosure.

**Exhibit TT** — Calhoun County Schedule of Findings and Responses, FY2023 (pages 87-91) and FY2024 (pages 89-99): Three consecutive years of material weakness findings naming the Master in Equity's office for lack of bank reconciliation controls; $14.1 million in FY2023 accounting errors and $2.5 million in FY2024 accounting errors across fifteen county funds each year; and FY2024 Finding 2024-005 documenting the Calhoun County Sheriff's Department's maintenance of an undisclosed off-books bank account with no reconciliation and no oversight, flagged as a misappropriation risk.

## QUICK-REFERENCE TABLE